## THE THOMPSON.

1. Prize courts properly deny damages or costs where there has been "probable cause" for seizure.
2. Probable cause exists where there are circumstances sufficient to warrant suspicion, even though not sufficient to warrant condemnation.
3. These principles applied to a case before the court where a captured vessel was restored, but without costs or damages.

THE brig "Thompson," on her return voyage to Halifax from Nassau, was captured at sea with a cargo of 486 casks of turpentine and 81 bales of cotton, on the 16th of June, 1863, by the government steamer, the United States, and sent into the port of New York for adjudication. The capture was made on suspicion that the vessel had broken the blockade of our Southern coast, established by our govern-

ment during the rebellion, or had on board a cargo brought from a blockaded port, and transferred to her under circumstances justifying condemnation. One Clements, of Nova Scotia, in behalf of himself and of a certain Martin & Co., of Nassau, all parties being British subjects, put in a claim for the cargo; another British subject claiming as owner the vessel.

In favor of the claimants were the facts that the vessel when hailed had surrendered without opposition and submitted freely to search; that her papers were unspoiled, regular, and apparently fair; that the master and ship's company were British subjects, without any interest in either the vessel or cargo; that, so far as the face of things showed, the voyage commenced at Halifax and was to have ended there; that the vessel made no port between Halifax and Nassau on her outward voyage, nor any between the same places on her return, and that she was not near any port when captured; neither were any proofs given that the cargo was procured from a blockaded port by any person or persons on board of or interested in the prize vessel, or that it was the property of such person.

On the other hand was the fact well known that, during the rebellion, the subjects of Great Britain, actively engaged in attempts to break our blockade, made the British island of Nassau an *entrepôt*, thus dividing their operations into two parts; first running vessels from the blockaded port to this "neutral" island, and then transhipping their cargoes at it to other vessels, on which they were carried *as if* on a new voyage to some other, the originally real port of destination; and so *vice versa*.

In the specific case before the court it was shown that a schooner, named the Argyle, from Wilmington, North Carolina, with a valuable cargo of cotton and spirits of turpentine, having escaped the vigilance of our fleet, had reached the harbor of Nassau; that she did not discharge her cargo at the wharf, but hauled alongside the Thompson, which was at anchor, and that she transferred enough of her cargo to the latter vessel to load it. "I was told," said the cook of

the Thompson, one witness who proved these facts, "that the captain of the Argyle owned part of the vessel. He was a Southern man, from Wilmington."

In addition to this it was obvious that Martin & Co., claimants of the cargo, were more or less in sympathy with the rebel cause and with the interests of blockade runners. They write to their correspondents at New York and Halifax as follows:

NASSAU, N. P., June 5, 1863.

MESSRS. WIER & Co., HALIFAX, N. S.

DEAR SIRS: We are in receipt of yours of 8th May; contents noted; your craft has not yet arrived. Will care for her when she does.

We have sent by this brig a cargo consisting of 486 casks spirits of turpentine and 81 bales of cotton. We desire it disposed of most to our advantage, either by shipping to England or America, as may appear. We shall write Messrs. Dollner, Potter & Co., of New York, immediately on arrival of the brig. You will telegraph to them and request their instructions. *We are happy to announce the arrival of the schooner Argyle with a full and valuable cargo, about* $42,000. The old thing is about being used up, her bottom being badly wormed. You will, of course, upon consultation with Captain Clements, and Dollner, Potter & Co., if they so decide it most to the interests of all concerned, sell at Halifax. *We do not like to have our property shipped on our account to the United States.* Captain Clements is the owner of one-half the cargo, being that brought out by "Argyle."

*We are largely into steamers; one leaves about the 10th for Dixie* with valuable cargo; will bring back 1200 bales cotton. Don't you want to invest three to five dollars in a good company. One company's stock is already worth 1200 per cent. in cost in gold.

We are doing quite well. Write often.

Yours, respectfully,

MARTIN & Co.

NASSAU, N. P., June 5, 1863.

MESSRS. DOLLNER, POTTER & Co., NEW YORK.

DEAR SIRS: We inclose herewith invoice and bill of lading of cargo cn board brig "Thompson," consigned to Messrs. B. Wier

& Co.   We have instructed them to confer with you in regard
to its disposition, as under our present situation we cannot ship
our stuff to you direct.   You will order it wherever you may,
on consultation with them, agree is most to our interests.   We
have instructed them of this fact.   The cargo is jointly owned
by the owners of the A 1 boat.

*We are happy to tell you the famous boat arrived ten days ago
with 460 casks spirits, 90 bales cotton, and 50 to 60 barrels No. 2
rosin in bulk, which we shall send to you as soon as a chance offers.
We've also 28 bales on hand.*   We will write you by steamer at
once so as to go on Monday.

Yours truly,

MARTIN & CO.

The District Court for New York, where the libel was
filed, considering that there was sufficient cause to bring
the vessel and cargo in for adjudication, but not enough to
condemn them, restored them both, but restored them *with-
out damages or costs.*   From this last part of the decree the
claimants, who insisted on recompense in damages, severally
appealed.

*Mr. Donohue, in their behalf.*

1. *As to the vessel.*   No cause whatever existed, either at
the time of seizure or trial, for her capture.   All her papers
were regular and fair; she was bound on a legitimate voy-
age, and in its due prosecution.   Being a neutral, owing to
us no allegiance, and taken on the high seas, she is entitled
to recompense for her damages.

2. *As to the cargo.*   It is clear that this cargo, if proved to
have run the blockade, had reached the territory of a foreign
nation, the home of one of the claimants, and was within his
power in such neutral country.   The mere fact of so having
run the blockade, no more subjects it to forfeiture than does
the same fact subject most of the cotton to be found on the
high seas between Havana, Matamoras, Nassau, and Euro-
pean or American ports.   Almost all such cotton has been
run out from blockaded ports.   In fact, every day shows the

arrival and entry of such cotton in our own ports. Blockade-running is not a crime. It is but an enterprise attended with peril. Neutrals have rights quite as good as belligerents. Because two nations have got into a quarrel—an absurd or wicked one perhaps—a third nation, which did nothing to bring it on, and cares nothing, perhaps, about it, except that it shall come to a conclusion, is not to have her commerce ruined. The restriction upon the rights of third parties must not be made *too* oppressive.

3. *As to both vessel and cargo.* By the nature of prize evidence, the claimant has but little means of proving bad faith, or showing bad faith in the captors; but, in this case, we submit that the seizure was a speculation, proving an intent to make the appearance of official duty cover an ulterior and interested motive. Extraordinary conduct, in such cases, is liable to severe censure.* When dealing with foreign nations, a frank and generous system is to be established. Foreigners will thus understand, as they have understood, that while we can and will protect and enforce our rights, we are not disposed to cover speculative efforts to get prize-money.

Finally. No amount of good intention or good faith can excuse a damage to a neutral, if the captor is mistaken in law as to his rights, and he has the means before him to ascertain the facts. In the Acteon,† where the vessel was in good faith, but without right destroyed, the court says:

" There are circumstances that may have afforded very good reason for destroying the vessel, and made it a meritorious act in Captain Capel, as far as his own judgment is concerned; but these furnish no reason why the American owner should suffer. It does not appear that Captain Capel is charged with having acted with corrupt or malicious motives. If, as I believe to have been the case, he has acted from a sense of duty and of obedience to orders, I can have no doubt that he will be indemnified. I must pronounce for costs and damages, and this without imputation in the conduct of the captain." " If the

---

* Le Louis, 2 Dodson, 240.                    † 2 Dodson, 51, 52.

captor has acted from error and mistaken duty, the suffering party is still entitled to full compensation (if not contributing to the loss)."

In *The John,*\* the court says:

"Most certainly it is not sufficient for a party to plead ignorance as a legal excuse for making compensation to another, if his ignorance was vincible to himself at the time at which the transaction took place. In an unfortunate case like the present, the court would certainly be disposed to give the captain all possible relief; but I need not add, that no relief is possible which cannot be given consistently with the justice due the claimant—that is the true rule."

We respectfully submit, then, that, on well-settled principles, on evidence here, the court was wrong in withholding costs and damages from us, and the decree, in that respect, should be reversed.

*Mr. Coffey, special counsel of the United States, contra.* The evidence shows not that the court below leaned too much in favor of the captors, but that it went too far in favor of the claimants. It shows that the cargo of the Thompson consisted certainly in part, and probably in whole, of the cargo which had broken the blockade of the port of Wilmington on the Argyle; that it was transhipped from the Argyle to the Thompson, without any landing whatever at Nassau; that no change of ownership or possession of the cargo took place at Nassau; that it never entered into the commerce or became part of the common stock of Nassau, and that its transfer to the Thompson for carriage to Halifax was part of the commercial venture which had its origin in Wilmington, and would have had its end at Halifax. The cargo brought from Wilmington to Nassau on the Argyle had *no commercial destination* to Nassau, and that port can in no just commercial sense be called the end of its voyage from Wilmington. It was simply an intermediate port for transhipment on the way from Wilmington to Halifax.

---

\* 2 Dodson, 51, 339.

The evidence discloses, moreover, the existence of an organization of blockade-breakers, represented at Nassau by Martin & Co.; at Halifax, by B. Wier & Co.; at New York, by Døllner, Potter & Co., and of which Clements, one of the claimants, is also an active partner. Adopting the familiar devices by which blockade-breakers sought to lessen the risks of their business, they divided their operations into two parts; first, running vessels from the blockaded port to Nassau, and, secondly, transhipping their cargoes at Nassau to other vessels, on which they were transported, as if on a new voyage, to Halifax, or some other port of real destination. The cargoes thus run out were to be sold at the port of real destination, "upon consultation" of the parties interested, as they should "decide it most to the interests of all concerned." Of the vessels employed in this business, the Argyle is a sample of one class, and the Thompson of the other. They were as much parts of one commercial venture, common agents in a single voyage, beginning at Wilmington, and ending at Halifax, as are two locomotives which draw a train of cars over separate parts of the same railroad.

This cargo was shipped at Wilmington, with the intention of being at Nassau transhipped for further transportation to its market, *with unchanged ownership and control*. This *intention* in the original shipment furnishes the test by which a prize court will determine the *status* of the cargo when captured, if the cargo be taken on the voyage, prosecuted in execution of that intention.

There was thus sufficient ground even for condemnation. That both vessel and cargo were not condemned is evidence that the rights of neutrals are respected by our courts with sensitive regard.

But if the facts would not have justified condemnation, beyond question they justified the refusal of costs and damages. For they amount to proof of probable cause of capture; and this is the test by which, in doubtful cases, prize courts determine whether costs and damages ought to be

allowed or refused, and the question is one purely in the discretion of the court.

Mr. Justice DAVIS delivered the opinion of the court.

The District Courts of the United States have original exclusive jurisdiction in questions of prize, and are authorized to decree restitution in whole or in part when the capture is wrongful; and if it is made without *probable cause,* may order and decree damages and costs against the captors.*

In time of war, the party who makes a seizure does not always act at his peril, and is not always liable to damages and costs if he fails to establish the forfeiture of the vessel. In fact, prize courts deny damages in case of restitution when there was probable cause for the seizure, and are often justified in awarding to the captors their costs and expenses.†

The question recurs, what, in the sense of the prize law, is meant by the terms "*probable cause.*" Chief Justice Marshall, in *Locke* v. *United States,*‡ held that the terms "probable cause," according to their usual acceptation, meant less than evidence which would justify condemnation, and in all cases of seizure had a fixed and well-known meaning; that they import a seizure made under circumstances which warrant suspicion. The court in that case were construing the 71st section of the collection law of 1799, which provided that the *onus probandi* should be on the claimant only where probable cause was shown for the prosecution. It was contended, that in order to justify seizure, the evidence must be such as, if unanswered, would justify condemnation. But the court held that such a construction would render totally inoperative the provision of the act of Congress. Judge Story, in *The George,*§ which was a libel for damages for an alleged illegal capture, gave the same exposition of the terms "probable cause" in matters of prize, and held that the capture of a ship was justifiable where the circumstances were

---

* Glass *v.* The Sloop Betsy, 3 Dallas, 16; Act of June 26, 1812, § 6; 2 Stat. at Large, 161.        † The Apollon, 9 Wheaton 372.

‡ 7 Cranch, 339.        § 1 Mason, 24.

such as would warrant a reasonable ground of suspicion that she was engaged in an illegal traffic.  And such is the view held by all writers on maritime warfare and prize.*  To adopt a harsher rule, and hold that the captors must decide for themselves the merits of each case, would involve perils which few would be willing to encounter.

Testing this case by these principles, was the District Court justified in decreeing restitution without costs and damages against the captors?

Does not the fact that the schooner Argyle did not discharge her cargo at Nassau, but hauled alongside of the Thompson, then at anchor, and transferred enough of her cargo to load the latter vessel, afford a reasonable ground of suspicion that there was concert between the vessels, and that the Thompson was purposely at Nassau to receive the cargo of the Argyle?  And if further.evidence was wanted to fix the character of the transaction, it is furnished in the letters of Martin & Co., who claim, in conjunction with Captain Clements, the ownership of the cargo, to Wier & Co., of Halifax, and Dollner, Potter & Co., of New York.  These letters are written in a strain of high exultation.  The Argyle has arrived with a cargo worth $42,000, in which Clements is interested, and Martin & Co. are sending steamers to Southern ports for return cargoes of cotton, in which ventures they want the participation of Wier & Co.  "The famous boat" with cotton, rosin, and casks of spirit has also reached port, and would be sent forward as soon as an opportunity offered.  And, withal, Martin & Co., as if fearing evil, dread to have their property shipped on their account to the United States.  Could any foreign merchant interested in lawful commerce wish to avoid the markets of this country?

It is too plain for controversy, that all these parties were extensively engaged in illegal traffic with the States in rebellion, and that the business was profitable.  And the whole evidence tends strongly to show that the voyage from Wil-

---

* Story's Notes, by Pratt; The St. Antonius, 1 Acton, 113.

mington to Halifax was a continuous one; that there was no intention to terminate it at Nassau, and that the cargo of the Argyle was to be reshipped with unbroken ownership and control, so that it could be taken to a port which furnished a better market. If such was the intention, when the cargo left Wilmington, then its status is fixed, and the original guilt continued to the time of the capture, notwithstanding the stoppage at an intermediate port, and transhipment.*

A case of " probable cause" is clearly made out, and it is unnecessary to discuss the evidence with a view of showing whether the cargo or vessel should have been condemned, as the captors do not complain of the judgment of the court below.

The District Court committed no error in refusing to give the claimants damages and costs, as against the United States, or the captors.

DECREE AFFIRMED WITH COSTS.

---

\* The Thomyris, Edwards, 17; The Maria, 5 Robinson, 365; The Maria, 6 Id. 201; The Charlotte Soph'a, Id. 204, note; The William, 5 Id. 385.