## THE OLINDE RODRIGUES.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF SOUTH CAROLINA.

No. 704. Argued April 11, 13, 1899. — Decided May 15, 1899.

A blockade to be binding must be known to exist.

There is no rule of law determining that the presence of a particular force is necessary in order to render a blockade effective, but, on the contrary, the test is whether it is practically effective, and that is a mixed question, more of fact than of law.

While it is not practicable to define what degree of danger shall constitute a test of the efficiency of a blockade, it is enough if the danger is real and apparent.

An effective blockade is one which makes it dangerous for vessels to attempt to enter the blockaded port; and the question of effectiveness is not controlled by the number of the blockading forces, but one modern cruiser is enough as matter of law, if it is sufficient in fact for the purpose, and renders it dangerous for other craft to enter the port.

The blockade in this case was practically effective, and, until it should be raised by an actual driving away by the enemy, it was not open to a neutral trader to ask whether, as against a possible superiority of the enemy's fleet, it was or was not effective in a military sense.

After the captors had put in their proofs, the claimant, without introducing anything further, moved for the discharge and restitution of the steamship, on the ground of the ineffective character of the blockade and because the evidence did not justify a decree of condemnation; and in addition claimed the right to adduce further proofs, if its motion

should be denied. *Held*, that the settled practice of prize courts forbids the taking of further proof under such circumstances.

The entire record in this case being considered, the court is of opinion that restitution of the Olinde Rodrigues should be awarded, without damages, and that payment of the costs and expenses incident to her custody and preservation, and of all costs in the cause, except the fees of counsel, should be imposed upon the ship.

THIS was a libel filed by the United States against the steamship Olinde Rodrigues and cargo in the District Court for South Carolina, in a prize cause, for violation of the blockade of San Juan, Porto Rico. The steamship was owned and claimed by La Compagnie Générale Transatlantique, a French corporation.

The Olinde Rodrigues left Havre, June 16, 1898, upon a regular voyage on a West Indian itinerary prescribed by the terms of her postal subvention from the French government. Her regular course, after touching at Paulliac, France, was St. Thomas, San Juan, Port au Platte or Puerto Plata, Cape Haytien, St. Marque, Port au Prince, Gonaives, and to return by the same ports, the voyage terminating at Havre. The proclamation of the President declaring San Juan in a state of blockade was issued June 27, 1898. The Olinde Rodrigues left Paulliac June 19, and arrived at St. Thomas July 3, 1898, and on July 4, in the morning, went into San Juan, Porto Rico. She was seen by the United States auxiliary cruiser Yosemite, then blockading the port of San Juan.

On the fifth of July, 1898, the Olinde Rodrigues came out of the port of San Juan, was signalled by the Yosemite, and on communicating with the latter asserted that she had no knowledge of the blockade of San Juan. Thereupon a boarding officer of the Yosemite entered in the log of the Olinde Rodrigues an official warning of the blockade, and she went on her way to Puerto Plata and other ports of San Domingo and Haiti. She left Puerto Plata on her return from these ports, July 16, 1898, and on the morning of July 17 was captured by the United States armored cruiser New Orleans, then blockading the port of San Juan, as attempting to enter that port. A prize crew was put on board and the vessel was

taken to Charleston, South Carolina, where she was libelled as before stated, July 22, 1898. Depositions of officers, crew and persons on board the steamship were taken by the prize commissioners *in preparatorio*, in answer to certain standing interrogatories, and the papers and documents found on board were put in evidence. Depositions of officers and men from the cruiser New Orleans were also taken *de bene esse*, but were not considered on the preliminary hearing except on a motion by the District Attorney for leave to take further proofs.

The cause having been heard on the evidence *in preparatorio*, the District Judge ruled, August 13, for reasons given, that the Olinde Rodrigues could not, under the evidence as it stood, be condemned for her entry into the blockaded port of San Juan on July 4, and her departure therefrom July 5, 1898; nor for attempting to enter the same port on July 17; but that the depositions *de bene esse* justified an order allowing further proofs, and stated also that an order might be entered, "discharging the vessel upon stipulation for her value, should the claimant so elect." 89 Fed. Rep. 105. An order was accordingly entered that the captors have ninety days to supply further proof "as to the entry of the 'Olinde Rodrigues' into the port of San Juan, Porto Rico, on July 4, 1898, and as to the courses and movements of said vessel on July 17, 1898;" and "that the claimants may thereafter have such time to offer testimony in reply as may seem proper to the court."

The cargo was released without bond, and on September 16 the court entered an order releasing the vessel on "claimants giving bond by the Compagnie Générale Transatlantique, its owners, without sureties, in the sum of $125,000 conditioned for the payment of $125,000 upon the order of the court in the event that the vessel should be condemned." The bond was not given, and the vessel remained in custody.

Evidence was taken on behalf of the United States, and the cause came on for hearing on a motion by the claimants for the discharge and restitution of the steamship on the grounds: (1) That the blockade of San Juan at the time of the capture of the Olinde Rodrigues was not an effective

blockade; (2) That the Olinde Rodrigues was not violating the blockade when seized.

The District Court rendered an opinion December 13, 1898, holding that the blockade of San Juan was not an effective blockade, and entered a decree ordering the restitution of the ship to the claimants. 91 Fed. Rep. 274. From this decree the United States appealed to this court and assigned errors to the effect: (1) That the court erred in holding that there was no effective blockade of the port of San Juan on July 17, 1898; (2) That the court erred in not finding that the Olinde Rodrigues was captured while she was violating the blockade of San Juan, July 17, 1898, and in not decreeing her condemnation as lawful prize.

*Mr. J. P. K. Bryan* and *Mr. Assistant Attorney General Hoyt* for appellant.

*Mr. Edward K. Jones* for appellee.

MR. CHIEF JUSTICE FULLER, after making the above statement, delivered the opinion of the court.

We are unable to concur with the learned District Judge in the conclusion that the blockade of the port of San Juan at the time this steamship was captured was not an effective blockade.

To be binding, the blockade must be known, and the blockading force must be present; but is there any rule of law determining that the presence of a particular force is essential in order to render a blockade effective? We do not think so, but on the contrary, that the test is whether the blockade is practically effective, and that that is a question, though a mixed one, more of fact than of law.

The fourth maxim of the Declaration of Paris, (April 16, 1856,) was: "Blockades, in order to be binding, must be effective, that is to say, maintained by a force sufficient really to prevent access to the coast of the enemy." Manifestly this broad definition was not intended to be literally applied.

The object was to correct the abuse, in the early part of the century, of paper blockades, where extensive coasts were put under blockade by proclamation, without the presence of any force, or an inadequate force; and the question of what might be sufficient force was necessarily left to be determined according to the particular circumstances.

This was put by Lord Russell in his note to Mr. Mason of February 10, 1861, thus: "The Declaration of Paris was in truth directed against what were once termed 'paper blockades;' that is, blockades not sustained by any actual force, or sustained by a notoriously inadequate naval force, such as an occasional appearance of a man-of-war in the offing or the like. . . . The interpretation, therefore, placed by Her Majesty's government on the Declaration was, that a blockade, in order to be respected by neutrals, must be practically effective. . . . It is proper to add, that the same view of the meaning and effect of the articles of the Declaration of Paris, on the subject of blockades, which is above explained, was taken by the representative of the United States at the Court of St. James (Mr. Dallas) during the communications which passed between the two governments some years before the present war, with a view to the accession of the United States to that Declaration." Hall's Int. Law, § 260, p. 730, note.

The quotations from the Parliamentary debates, of May, 1861, given by Mr. Dana in note 233 to the eighth edition of Wheaton on International Law, afford interesting illustrations of what was considered the measure of effectiveness; and an extract is also there given from a note of the Department of Foreign Affairs of France of September, 1861, in which that is defined: "Forces sufficient to prevent the ports being approached without exposure to a certain danger."

In *The Mercurius*, 1 C. Rob. 80, 84, Sir William Scott stated: "It is said, this passage to the Zuyder Zee was not in a state of blockade; but the ship was seized immediately on entering it; and I know not what else is necessary to constitute blockade. The powers who formed the armed neutrality in the last war, understood blockade in this sense; and

Russia, who was the principal party in that confederacy, described a place to be in a state of blockade, when it is dangerous to attempt to enter into it."

And in *The Frederick Molke*, 1 C. Rob. 86, the same great jurist said: "For that a legal blockade did exist, results necessarily from these facts, as nothing farther is necessary to constitute blockade, than that there should be a force stationed to prevent communication, and a due notice, or prohibition given to the party."

Such is the settled doctrine of the English and American courts and publicists, and it is embodied in the second of the instructions issued by the Secretary of the Navy, June 20, 1898, General Order No. 492: "A blockade to be effective and binding must be maintained by a force sufficient to render ingress to or egress from the port dangerous."

Clearly, however, it is not practicable to define what degree of danger shall constitute a test of the efficiency and validity of a blockade. It is enough if the danger is real and apparent.

In *The Franciska*, 2 Spinks, 128, Dr. Lushington, in passing on the question whether the blockade imposed on the port of Riga was an effective blockade, said: "What, then, is an efficient blockade, and how has it been defined, if, indeed, the term 'definition' can be applied to such a subject? The one definition mentioned is, that egress or entrance shall be attended with evident danger; another, that of Chancellor Kent, (1 Kent's Com. 146,) is, that it shall be apparently dangerous. All these definitions are and must be, from the nature of blockades, loose and uncertain; the maintenance of a blockade must always be a question of degree, — of the degree of danger attending ships going into or leaving a blockaded port. Nothing is further from my intention, nor, indeed, more opposed to my notions of the Law of Nations, than any relaxation of the rule that a blockade must be efficiently maintained; but it is perfectly obvious that no force could bar the entrance to absolute certainty; that vessels may get in and get out during the night, or fogs, or violent winds, or occasional absence; that it is most difficult to judge from numbers alone."

" It is impossible," says Mr. Hall, (§ 260,) " to fix with any accuracy the amount of danger in entry which is necessary to preserve the validity of a blockade. It is for the prize courts of the belligerent to decide whether in a given instance a vessel captured for its breach had reason to suppose it to be non-existent; or for the neutral government to examine, on the particular facts, whether it is proper to withhold or to withdraw recognition."

In *The Hoffnung*, 6 C. Rob. 112, 117, Sir William Scott said : " When a squadron is driven off by accidents of weather, which must have entered into the contemplation of the belligerent imposing the blockade, there is no reason to suppose that such a circumstance would create a change of system, since it could not be expected that any blockade would continue many months, without being liable to such temporary interruptions. But when a squadron is driven off by a superior force, a new course of events arises, which may tend to a very different disposition of the blockading force, and which introduces therefore a very different train of presumptions, in favor of the ordinary freedom of commercial speculations. In such a case the neutral merchant is not bound to foresee or to conjecture that the blockade will be resumed." And undoubtedly a blockade may be so inadequate, or the negligence of the belligerent in maintaining it may be of such a character, as to excuse neutral vessels from the penalties for its violation. Thus in the case of an alleged breach of the blockade of the island of Martinique, which had been carried on by a number of vessels on the different stations, so communicating with each other as to be able to intercept all vessels attempting to enter the ports of the island, it was held that their withdrawal was a neglect which " necessarily led neutral vessels to believe these ports might be entered without incurring any risk." *The Nancy*, 1 Acton, 57, 59.

But it cannot be that a vessel actually captured in attempting to enter a blockaded port, after warning entered on her log by a cruiser off that port only a few days before, could dispute the efficiency of the force to which she was subjected.

As we hold that an effective blockade is a blockade so effec-

tive as to make it dangerous in fact for vessels to attempt to enter the blockaded port, it follows that the question of effectiveness is not controlled by the number of the blockading force. In other words, the position cannot be maintained that one modern cruiser though sufficient in fact is not sufficient as matter of law.

Even as long ago as 1809, in *The Nancy*, 1 Acton, 63, where the station of the vessel was sometimes off the port of Trinity and, at others, off another port more than seven miles distant, it was ruled that: "Under particular circumstances a single vessel may be adequate to maintain the blockade of one port and coöperate with other vessels at the same time in the blockade of another neighboring port;" although there Sir William Grant relied on the opinion of the commander on that station that the force was completely adequate to the service required to be performed.

The ruling of Dr. Lushington in *The Franciska*, above cited, was to that effect, and the text books refer to other instances.

The learned District Judge, in his opinion, refers to the treaty between France and Denmark of 1742, which provided that the entrance to a blockaded port should be closed by at least two vessels or a battery on shore; to the treaty of 1760 between Holland and the Two Sicilies prescribing that at least six ships of war should be ranged at a distance slightly greater than gunshot from the entrance; and to the treaty between Prussia and Denmark of 1818, which stipulated that two vessels should be stationed before every blockaded port; but we do not think these particular agreements of special importance here, and, indeed, Ortolan, by whom they are cited, says that such stipulations cannot create a positive rule in all cases even between the parties, "since the number of vessels necessary to a complete investment depends evidently on the nature of the place blockaded." 2 Ortolan, (4th ed.) 330, and note 2.

Nor do we regard Sir William Scott's judgment in *The Arthur*, (1814) 1 Dodson, 423, 425, as of weight in favor of claimants. In effect the ruling sustained the validity of the maintenance of blockade by a single ship, and the case was thus stated: "This is a claim made by one of His Majesty's

ships to share as joint-captor in a prize taken in the river Ems by another ship belonging to His Majesty, for a breach of the blockade imposed by the order in council of the 26th of April, 1809. This order was, among others, issued in the way of retaliation for the measures which had been previously adopted by the French government against the commerce of this country. The blockade imposed by it is applicable to a very great extent of coast, and was never intended to be maintained according to the usual and regular mode of enforcing blockades, by stationing a number of ships, and forming as it were an arch of circumvallation around the mouth of the prohibited port. There, if the arch fails in any one part, the blockade itself fails altogether; but this species of blockade, which has arisen out of the violent and unjust conduct of the enemy, was maintained by a ship stationed anywhere in the neighborhood of the coast, or, as in this case, in the river itself, observing and preventing every vessel that might endeavor to effect a passage up or down the river."

Blockades are maritime blockades, or blockades by sea and land; and they may be either military or commercial, or may partake of the nature of both. The question of effectiveness must necessarily depend on the circumstances. We agree that the fact of a single capture is not decisive of the effectiveness of a blockade, but the case made on this record does not rest on that ground.

We are of opinion that if a single modern cruiser blockading a port renders it in fact dangerous for other craft to enter the port, that is sufficient, since thereby the blockade is made practically effective.

What then were the facts as to the effectiveness of the blockade in the case before us?

In the proclamation of June 27, 1898, occurs this paragraph: "The United States of America has instituted and will maintain an effective blockade of all the ports on the south coast of Cuba, from Cape Frances to Cape Cruz, inclusive, and also of the port of San Juan, in the island of Porto Rico." (Proclamation No. 11, 30 Stat. 34.) The blockade thus announced was not of the coast of Porto Rico, but of the port

of San Juan, a town of less than 25,000 inhabitants, on the northern coast of Porto Rico, with a single entrance. From June 27 to July 14, 1898, the Yosemite, a merchant ship converted into an auxiliary cruiser, blockaded the port. Her maximum speed was fifteen and one half knots; and her armament ten 5-inch rapid firing guns, six 6-pounders, two 1-pounders, with greatest range of three and one half miles. While the Yosemite was blockading the port she ran the armed transport Antonio Lopez aground six miles from San Juan; gave a number of neutral vessels official notice of the blockade; warned off many from the port; and on the 5th of July, 1898, wrote into the log of the Olinde Rodrigues, off San Juan, the official warning of the blockade of San Juan. On July 14 and thereafter the port was blockaded by the armored cruiser New Orleans, whose maximum speed was twenty-two knots, and her armament six 6-inch breech-loading rifles, four 4.7-inch breech-loading rifles, ten 6-pounders, four 1.5-inch guns, corresponding to 3-pounders; four 3-pounders in the tops; four 37-millimetre automatic guns, corresponding to 1-pounders. The range of her guns was five and one half sea miles or six and a quarter statute miles. If stationary, she could command a circle of thirteen miles in diameter; if moving, at maximum speed, she could cover in five minutes any point on a circle of seventeen miles diameter; and in ten minutes any point on a circle of nineteen miles diameter; her electric search lights could sweep the sea by night for ten miles distance; her motive power made her independent of winds and currents; in these respects and in her armament and increased range of guns she so far surpassed in effectiveness the old-time war ships that it would be inadmissible to hold that even if a century ago more than one ship was believed to be required for an effective blockade, therefore this cruiser was not sufficient to blockade this port

Assuming that the Olinde Rodrigues attempted to enter San Juan, July 17, there can be no question that it was dangerous for her to do so, as the result itself demonstrated. She had had actual warning twelve days before; no reason existed for the supposition that the blockade had been pretermitted or relaxed :

her commander had no right to experiment as to the practical effectiveness of the blockade, and, if he did so, he took the risk; he was believed to be making the attempt, and was immediately captured. In these circumstances the vessel cannot be permitted to plead that the blockade was not legally effective.

After the argument on the motion to discharge the vessel, application was made by counsel for the claimant to the District Judge, by letter, that the Navy Department be requested to furnish the court with all letters or dispatches of the commanders of vessels blockading the port of San Juan in respect to the sufficiency of the force. And a motion was made in this court "for an order authorizing the introduction into the record of the dispatches of Captain Sigsbee and Commander Davis," dated June 27, 1898, and July 26, 1898, and published by the Navy Department in the "Appendix to the Report of the Chief of the Bureau of Navigation, 1898," pp. 224, 225, 642.

To this the United States objected on the grounds that isolated statements transmitting official information to superior officers, and consisting largely of opinion and hearsay, were not competent evidence; that the claimants had been afforded the opportunity to offer additional proof, and had not availed themselves thereof; that if the court desired to have these papers before it, then the Government should be permitted to define their meaning by counter proofs; and certain explanatory affidavits were, at the same time, tendered for consideration, if the motion were granted.

We need not specifically rule on the motion, or as to the admissibility of either the dispatches or affidavits, as we are satisfied that the dispatches have no legitimate tendency to establish that the blockade was not effective so far as the exclusion of trade from this port of the belligerent, whether in neutral or enemy's trading ships, was concerned. This country has always recognized the essential difference between a military and a commercial blockade. The one deals with the exclusion of trade, and the other involves the consideration of armed conflict with the belligerent. The necessity of a greater blockading force in the latter case than in the former is obvious. The difference is in kind, and in degree.

Our Government was originally of opinion that commercial blockades in respect of neutral powers ought to be done away with; but that view was not accepted, and during the period of the Civil War the largest commercial blockade ever known was established. Dana's Wheat. Int. Law, (8th ed.) p. 671, note 232; 3 Whart. Int. Dig. § 361.

The letters of Captain Sigsbee, of the St. Paul, and of Commander Davis, of the Dixie, must be read in the light of this recognized distinction; and it is to be further remarked that after the letter of Captain Sigsbee of June 27 the New Orleans was sent by Admiral Sampson officially to blockade the port of San Juan, thereby enormously increasing its efficiency.

In his report of June 28, Appendix, Rep. Bur. Nav. 220, 222, Captain Sigsbee describes an attack on the St. Paul off the port of San Juan, June 22, by the Spanish cruiser Isabella II and by the torpedo boat destroyer Terror, in which engagement the St. Paul severely injured the Terror, and drove the attacking force back into San Juan, and in his letter of June 27 he wrote: "It is advisable to constantly keep the Terror in mind as a possible active force; but, leaving her out of consideration, the services to be performed by the Yosemite, of blockading a well-fortified port containing a force of enemy's vessels whose aggregate force is greater than her own, is an especially difficult one. If she permits herself to be driven away from the port, even temporarily, the claim may be set up that the blockade is broken."

It is true that in closing his letter of June 27 Captain Sigsbee said: "I venture to suggest that, in order to make the blockade of San Juan positively effective, a considerable force of vessels is needed off that port, enough to detach some to occasionally cruise about the island. West of San Juan the coast,[1] although bold, has outlying dangers, making it easy at

---

[1] The coast thus referred to is described in a work entitled "Navigation of the Gulf of Mexico and the Caribbean Sea," issued by the Navy Department, vol. I, 342, thus: "The shore appears to be skirted by a reef, inclosing numerous small cays and islets, over which the sea breaks violently, and it should not be approached within a distance of four miles."

present for blockade runners having local pilots to work in close to the port under the land during the night."

But we are considering the blockade of the port of San Juan and not of the coast, and while additional vessels to cruise about the island might be desirable in order that the blockade should be positively effective, we think it a sufficient compliance with the obligations of international law if the blockade made egress or ingress dangerous in fact, and that the suggestions of a zealous American naval commander, in anticipation of a conflict of armed forces before San Juan, that the blockade should be brought to the highest efficiency in a military as well as a commercial aspect, cannot be allowed to have the effect of showing that the blockade which did exist was, as to this vessel, ineffective in point of law.

And the letter of Commander Davis of the Dixie, of July 26, 1898, appears to us to have been written wholly from the standpoint of the efficiency of the blockade as a military blockade. He says: " Captain Folger kept me through the night of the 24th, as he had information which led him to believe that an attack would be made on his ship during the night. There are in San Juan, Porto Rico, the Terror, torpedo gunboat; the Isabella II, cruiser; a torpedo boat, and a gunboat. There is also a German steamer, which is only waiting an opportunity to slip out." And further : " It is Captain Folger's opinion that the enemy will attempt to raise the blockade of San Juan, and it is my opinion that he should be reënforced there with the least possible delay."

In our judgment these naval officers did not doubt the effectiveness of the commercial blockade, and had simply in mind the desirability of rendering the blockade, as a military blockade, impregnable, by the possession of a force sufficient to successfully repel any hostile attack of the enemy's fleet. The blockade was practically effective; had remained so; and was legal and binding, if not raised by an actual driving away of the blockading force by the enemy ; until the happening of which result the neutral trader had no right to ask whether the blockade, as against the possible superiority of the enemy's fleet, was or was not effective in a military sense.

But was this ship attempting to enter the port of San Juan, on the morning of July 17, when she was captured? It is contended by counsel for the claimant that if the rulings of the District Court should be disapproved of, an opportunity should still be given it to put in further proofs in respect of the violation of the blockade, notwithstanding it had declined to do so under the order of that court. That order gave ninety days to the captors for further proofs, and to the claimant, thereafter, such time for testimony in reply as might seem proper. After the captors had put in their proofs, the claimant, without introducing anything further, moved for the discharge and restitution of the steamship on the ground of the ineffective character of the blockade, and because the evidence did not justify a decree of condemnation; but undertook to reserve the right to adduce further proof, in the event that its motion should be denied. The District Court commented with disfavor upon such an attempt, and we think the claimant could not as matter of right demand that the cause should be opened again. The settled practice of prize courts forbids the taking of further proofs under such circumstances; and in the view we take of the cause it would subserve no useful purpose to permit this to be done.

On the proofs before us the case is this: The Olinde Rodrigues was a merchant vessel of 1675 tons, belonging to the Compagnie Générale Transatlantique, engaged in the West India trade and receiving a subsidy from the French government for carrying its mails on an itinerary prescribed by the postal authorities. Her regular course was from Havre to St. Thomas, San Juan, Puerto Plata and some other ports, returning by the some ports to Havre. She sailed from Havre, June 16, and arrived at St. Thomas, July 3, and at San Juan the morning of July 4. The proclamation of the blockade of San Juan was issued June 27, while she was on the sea. The United States cruiser Yosemite was on duty in those waters, blockading the port of San Juan, and when her commander sighted the Olinde Rodrigues coming from the eastward toward the port he made chase, but before reaching her she had turned in and was under the protection

of the shore batteries. He lay outside until the next morning — the morning of July 5 — when he intercepted the steamship as she was coming out, and sent an officer aboard, who made this entry in her log : " Warned off San Juan, July 5th, 1898, by U. S. S. Yosemite. Commander Emory. John Burns, Ensign, U. S. Navy." The master of the Olinde Rodrigues, whose testimony was taken *in preparatorio*, testified that when he entered San Juan, July 4, he had no knowledge that the port was blockaded, and that he first heard of it from the Yosemite on July 5, when he was leaving San Juan. After the notification he continued his voyage on the specified itinerary, arriving at Gonaives, the last port outward, on July 12. On his return voyage he stopped at the same ports, taking on freight, passengers and mail for Havre. At Cape Haytien, on July 14, he received a telegram from the agent of his company at San Juan, telling him to hasten his arrival there by one day in order to take on fifty first class passengers, and he replied that the ship would not touch at San Juan, but would be at St. Thomas on the 17th. The purser testified that on the receipt of the cable from the consignee at San Juan, he told the captain " that since we were advised of the blockade of Porto Rico by the war ship, it was absolutely necessary not to stop; " and that " before me, the agent in Cape Haytien, sent a cablegram, saying ' Daim [the vessel] will not stop at San Juan, the blockade being notified.' "

The ship's master further testified that on the outward voyage at each port he had warned the agent of the company and the postal department that he would not touch at Porto Rico, that he would not take passengers for that point, and that the letters would be returned to St. Thomas, and that having received his clearance papers at Puerto Plata at half-past five o'clock on the evening of July 15, he did not leave until six o'clock in the morning of July 16, as he did not wish to find himself at night along the coast of Porto Rico.

The ship was a large and valuable one, belonging to a great steamship company of world-wide reputation ; she was on her return voyage laden with tobacco, sugar, coffee and other products of that region ; she had no cargo, passengers or mail for

San Juan; she had arrived off that port in broad daylight, intentionally according to the captain; her regular itinerary on her return to France would have taken her from Port au Platte to San Juan, and from San Juan to St. Thomas, and thence to Havre, but as San Juan was blockaded and she had been warned off, and could not lawfully stop there, her route was from Port au Platte to St. Thomas, which led her directly by and not many miles from the port of San Juan.

The only possible motive which could be or is assigned for her to attempt to break the blockade is that the consignee at San Juan cabled the captain at Cape Haytien that he must stop at San Juan and take fifty first class passengers. At this time the fleet of Admiral Cervera had been destroyed; Santiago had fallen; and the long reign of Spain in the Antilles was drawing to an end. Doubtless the transportation of fifty first class passengers would prove remunerative, especially as some of them might be Spanish officials, and Spanish archives and records, and Spanish treasure, might accompany them if they escaped on the ship. It is forcibly argued that these are reasonable inferences, and afforded a sufficient motive for the commission of the offence. But as, where the guilty intent is established, the lack of motive cannot in itself overthrow it, so the presence of motive is not in itself sufficient to supply the lack of evidence of intent. Now, in this case, the captain not only testified that he answered the cable to the effect that he should not stop at San Juan, but the purser explicitly stated that the agent at Cape Haytien sent the telegram for the captain, specifically notifying the agent at San Juan that the ship would not stop there, the blockade having been notified. It is true, that the cablegram was not produced, but this was not to be expected in taking the depositions *in preparatorio*, and particularly as it was not the captain's own cablegram, but that of the agent at Cape Haytien. There is nothing in the evidence to the contrary, and under the liberality of the rules of evidence in the administration of the civil law, we must take this as we find it, and, as it stands, the argument that a temptation was held out is answered by the evidence that it was resisted.

Such being the situation, and the evidence of the ship's officers being explicit that the vessel was on her way to St. Thomas and had no intention of running into San Juan, the decree in her favor must be affirmed on the merits, unless the record elsewhere furnishes evidence sufficient to overcome the conclusion reasonably deducible from the facts above stated.

Among the papers delivered to the prize master were certain bills of health, five of them by consuls of France, namely, July 9, from St. Marc, Haiti, giving the ship's destination as Havre, with intermediate ports; July 11, from Gonaives, Haiti, giving no destination; July 13, from Port au Prince, July 14, from Cape Haytien, July 15, from Puerto Plata, all naming Havre as the destination; and three by consuls of Denmark, July 13, from Port au Prince, July 14, from Cape Haytien, and July 15, from Puerto Plata, all naming St. Thomas as the destination. When the captain testified August 2, in answer to the standing interrogatories, he said nothing about any Spanish bills of health. The deposition was reread to the captain, August 3, and on the next day, August 4, he wrote to the prize commissioners desiring to correct it, saying: "I fear I have badly interpreted several questions. I was asked if I had destroyed any papers on board or passports. I replied, no. The papers — documents — on board for our voyage had been delivered up proper and legal to the prize master. This is absolutely the truth, not including in the documents two Spanish bills of health, one from Port au Prince and one from Cape Haytien, which we found in opening our papers, although they had not been demanded. Not having any value for us, I said to the steward to destroy them on our arrival at Charleston, as we often do with papers that are useless to us. The regular expedition only counts from the last port, which was Puerto Plata, and I refused to take it from our agent for Porto Rico. I swear that at my examination I did not think of this, and it is only on my return from signing that the steward recalled it to me. I never sought to disguise the truth, since I wish to advise you of it as soon as possible."

On the 5th of August the purser answered the interroga-

tories, and testified that papers were given him by the consignees of the steamer at Port au Prince in a box at the time of sailing, and he found in the box one manifest of freight in ballast, and it was the same thing at Cape Haytien.  At Puerto Plata the agent of the company came on board on their arrival there, and " the captain told him that there was no Spanish clearance; there was no need of it, and it was not taken."  The captain said to the agent " it was not necessary, because we are not going to San Juan, being notified of the blockade."  " When we arrive in a port we put up a placard of the date of departure and the time of sailing and the destination, and it was put up by my personal order from the captain that we sailed for St. Thomas directly, and it was fixed up in the night of the 15th of July. . . . We were to start on the morning of the 16th, at 6 o'clock in the morning, the captain saying he did not want to fall into the hands of the American cruisers during the night.  The night before our arrival in Charleston, the doctor says to me, 'I have a bill of health, Spanish account, from Cape Haytien and Port au Prince,' and I told him I would speak to the captain and ask him what to do with these papers that I had found in sorting my papers — these papers in the pigeon holes.  I told the captain that morning, and he told me that we had better destroy them, because we don't want them; that it is not our expedition, and that a true exposition is valuable only for the last port to the Spanish port."

On the 5th the captain was permitted to testify, in explanation, saying, among other things: " The reason that we did not give up the two bills of health is because they did not form a part of the clearance of our ship for our itinerary, and they were left in the pigeon holes where they were.  It was at the time of our arrival at the quarantine at Charleston that the purser spoke to me of them, and I told him that they were good for nothing and to tear them up.  The captain wishes to add that he did not remember the instance the other day about the destruction of papers, that he has just told us about, and that he never had any intention to disguise anything or to deceive."

Counsel for the Government insist that the intention of the Olinde to run the blockade is necessarily to be inferred from the possession of these bills of health and their alleged concealment and destruction. Doubtless the spoliation of papers, and, though to a less degree, their concealment, is theoretically a serious offence, and authorizes the presumption of an intention to suppress incriminating evidence, though this is not an irrebuttable presumption.

In *The Pizarro*, 2 Wheat. 227, 241, the rule is thus stated by Mr. Justice Story: "Concealment, or even spoliation of papers is not of itself a sufficient ground for condemnation in a prize court. It is, undoubtedly, a very awakening circumstance, calculated to excite the vigilance, and to justify the suspicions of the court. But it is a circumstance open to explanation, for it may have arisen from accident, necessity or superior force; and if the party in the first instance fairly and frankly explains it to the satisfaction of the court, it deprives him of no right to which he is otherwise entitled. If, on the other hand, the spoliation be unexplained, or the explanation appear weak and futile; if the cause labor under heavy suspicions, or there be a vehement presumption of bad faith, or gross prevarication, it is made the ground of a denial of further proof, and condemnation ensues from defects in the evidence which the party is not permitted to supply."

It should be remembered that the first deposition of the captain was given in answer to standing interrogatories, and not under an oral examination; that the statute (Rev. Stat. § 4622) forbade the witness "to see the interrogatories, documents or papers, or to consult counsel, or with any persons interested, without special authority from the court;" that he was born and had always lived in France, and was apparently not conversant with our language; indeed, he protested, as "neither understanding nor speaking English," "against all interpretation or translation contrary to my thought;" that the deposition having been reread to him the day after it was taken, he detected its want of fulness, and immediately wrote the prize commissioners on the subject with a view to cor-

rection; and that it was after this, and not before, that the purser testified.

Transactions of this sort constitute in themselves no ground for condemnation, but are evidence, more or less convincing, of the existence of such ground; yet, taking the evidence in this case together, we are not prepared to hold that the explanation as to how these bills came to be received on board, neglected when the papers were surrendered, and finally torn up, was not sufficient to obviate any decisive inference of objectionable intention.

The Government further insisted that the Olinde Rodrigues refused to obey the signal from the New Orleans to heave to and stop instantly, and turned only after she had fired, and that this conclusively established an intention to violate the blockade. The theory of the Government is that the French ship purposely held on so as to get under the protection of the batteries of San Juan.

The log of the Olinde Rodrigues states: "6.30, noticed the heights of San Juan. At 7.20, took the bearings of the fortress at 45 degrees, eight miles and one half crosswise. Noticed, at 7.50, a man-of-war. At 8.10, she signalled 'J. W.,' ["heave to and stop instantly."] I went towards it and made arrangements in order to receive the whale boat which is sent to us."

In a communication to the Ambassador of France at Washington, written July 17, and purporting to give a full account of the matter, the captain said that he "was some time before seeing her signal, on account of the distance and of the sun. Suspecting what she wanted, I hoisted the 'perceived' and stopped."

He testified that he turned his vessel to the war ship before the gun was fired, which was at 8.12, but on this point the evidence is strongly to the contrary. We are inclined to think that some allowance should be made for imperfect recollection in the rapid passage of events. The Olinde Rodrigues was comparatively a slow sailer, (ten to twelve knots,) and if the captain stopped on seeing the signal, and turned towards the war ship with reasonable promptness, a settled purpose to

defy the signal ought not to be imputed, whether she started towards the New Orleans just before, just after, or just as the shot was fired.

The stress of the contention of the Government is, however, that the Olinde Rodrigues was on a course directly into the port of San Juan at the time her progress was arrested. It is extremely difficult to be precise in such a matter, as her course to reach St. Thomas necessarily passed in face of San Juan. The captain attached to his explanatory affidavit a sketch, "showing the usual route and the actual route which he was taking at the time of the capture, with the position of the capturing ship and his own ship," as follows, see p. 531.

But it appears from the entries of the second officer on the log of the Olinde Rodrigues that the ship was from one to five o'clock in the morning of July 17 on the course, (as corrected,) S. 69 E., and that from six to eight o'clock the course was S. 73 E.

The captain testified that at the time of capture : ".I had just passed the port of San Juan, about 7 or 8 miles eastward of the port, and about 9 miles from shore, about 9 miles from Morro. They judged the distance in passing as they do from all points."

The second officer said that " they were 9 miles from San Juan after having passed the port of San Juan and gone 4 miles east of it."

This testimony strikingly confirms Captain Folger's candid expression of opinion that though the master of the Olinde Rodrigues may have been going in and out of that port for years, he did not measure the distances, but " would run so far down the coast and order them to steer to a certain point to head in."

The commander of the New Orleans admitted " that south 69 is the proper course beforehand for the Culebra Passage," (the passage through which to reach St. Thomas,) but contested that the French vessel was making that course.

Lieutenant Rooney, the navigator of the New Orleans, laid down the positions upon a chart as follows, see p. 532.

### Opinion of the Court.

Opinion of the Court.

The point C is seven and two thirds miles from Morro, bearing S. W., and five miles from point D, the intersection of a line drawn west with north and south line through Morro. D is five and two thirds miles from Morro. The range of Morro guns was six and one half miles, and the range of the shore batteries, three miles east of Morro, also six and one half miles. According to this plat, the Olinde Rodrigues was slightly within the range of the Morro guns, but not within the range of the shore batteries. The New Orleans when she fired was close to the range of the shore batteries and something over a mile outside of the extreme range of the Morro guns.

And it is urged that the conclusion is inevitable that the French ship intended to run into the port and to draw the pursuing cruiser within the range of the Spanish guns. If her being in the neighborhood were not satisfactorily explained; if she persistently ignored the signal of the cruiser; and if her course was a course into the port of San Juan and not a proper course to reach St. Thomas, then the conclusion may be admitted; but it is not denied that she was in the neighborhood in the discharge of her duty, and we have already seen that she may be consistently regarded as not having defied the signal.

On the part of the captors, the witnesses concurred that the Olinde Rodrigues' course was laid for the port of San Juan, while on her behalf this was denied, except so far as her course for St. Thomas took her near the blockaded port. In addition to the witnesses from the New Orleans the telegraph operator on the Morro testified that the Olinde Rodrigues was coming directly toward the Morro, but changed her course when the shot was fired.

A principal reason given by the witnesses for concluding that the Olinde Rodrigues was making for San Juan was that her masts, as seen from the deck of the New Orleans, were open, thus indicating that she was sailing south or toward the port of San Juan. It was admitted that this would not necessarily be so unless the New Orleans was on the same line east and west with the other vessel, or, in other words, if the

New Orleans were to the north of the Olinde Rodrigues, the latter's masts might appear open without necessarily indicating that she was sailing south, or towards the land.  Lieutenant Rooney did not see her until after she was captured.  He is positive as to the approximate position of the New Orleans early in the morning before the Olinde Rodrigues was sighted, which had not occurred when he went below at 7.30, and he is positive as to the position of the New Orleans after the capture.  He places the position of the New Orleans at 6.50, when the last bearing observation was taken, at fifteen miles north of the coast and of the Morro.  At nine o'clock bearings were again taken, and she was about seven and two thirds miles from the Morro.  Lieutenant Rooney explained in his testimony the proper courses for a vessel sailing to St. Thomas, and stated that several courses might be properly steered, that one of them would be to pass about twelve miles north of the harbor of San Juan, and that there was nothing impracticable in a vessel reaching Culebra Point, with a view of going to St. Thomas, on a course of S. 69 E. from midnight to 5 o'clock, and a change at 5 o'clock to S. 73 E.  He also testified that a vessel bound for San Juan on an ordinary commercial voyage would have been nearer the shore than where the Olinde Rodrigues was when she was captured, and that it was probable that if she intended to go to San Juan and avoid the New Orleans she would have hugged the shore and not been out at sea.

Some of the evidence, in short, had a tendency to show that the Olinde Rodrigues, when sailing on a proper course for St. Thomas, would be drawing to the south, and that the New Orleans was to the north of her, in which case, obviously, the nearer the vessels approached the more open would the masts of the Olinde Rodrigues appear.  But the clear preponderance was that the captured ship was to the west of a north and south line drawn through Morro, and running nearly south just before or when the New Orleans fired.

It is impossible to deny that the testimony of Captain Folger, the commander of the New Orleans, and of his officers, was extremely strong and persuasive to establish that the

Olinde Rodrigues, when brought to, was intentionally heading for San Juan, and pursuing her course in such a manner as to draw the blockading cruiser in range of the enemy's batteries, and yet we must consider it in view of the evidence on behalf of the captured ship, and of the undisputed facts tending to render it improbable that any design of attempting to violate the blockade was entertained. The Olinde Rodrigues had neither passengers nor cargo for San Juan; in committing the offence, she would take the risk of capture or of being shut up in that port; she was a merchantman engaged in her regular business and carrying the mails; she was owned by a widely known and reputable company; her regular course, though interrupted by the blockade of that port, led directly by it, and not far from it; and the testimony of her captain and officers denied any intention to commit a breach.

The evidence of evil intent must be clear and convincing before a merchant ship belonging to citizens of a friendly nation will be condemned. And on a careful review of the entire evidence, we think we are not compelled to proceed to that extremity.

But, on the other hand, we are bound to say that, taking all the circumstances together and giving due weight to the evidence on behalf of the captors, probable cause for making the capture undoubtedly existed; and the case disclosed does not commend this vessel to the favorable consideration of the court.

Probable cause exists where there are circumstances sufficient to warrant suspicion though it may turn out that the facts are not sufficient to warrant condemnation. And whether they are or not cannot be determined unless the customary proceedings of prize are instituted and enforced. *The Adeline,* 4 Cranch, 244, 285; *The Thompson,* 3 Wall. 155. Even if not found sufficient to condemn, restitution will not necessarily be made absolutely, but may be decreed conditionally as each case requires, and an order of restitution does not prove lack of probable cause. *The Adeline, supra; Jennings* v. *Carson,* 4 Cranch, 2, 28, 29.

In the statement of Sir William Scott and Sir John Nicholl,

transmitted to Chief Justice Jay, then Minister to England, by Sir William Scott, September 10, 1794, " the general principles of proceeding in prize causes, in British Courts of Admiralty, and of the measures proper to be taken when a ship and cargo are brought in as prize within their jurisdictions," are set forth as laid down in an extract from a report made to the King in 1753 " by Sir George Lee, then Judge of the Prerogative Court, Dr. Paul, His Majesty's Advocate General, Sir Dudley Rider, His Majesty's Attorney General, and Mr. Murray, (afterwards Lord Mansfield,) His Majesty's Solicitor General; " and many instances are given where in the enforcement of the rules " the law of nations allows, according to the different degrees of misbehavior, or suspicion, arising from the fault of the ship taken, and other circumstances of the case, costs to be paid, or not to be received, by the claimant, in case of acquittal and restitution." Wheaton on Captures, Appendix, 309, 311, 312; Pratt's Story's Notes, p. 35.

In *The Appollon*, 9 Wheat. 362, 372, Mr. Justice Story said : " No principle is better settled in the law of prize than the rule that probable cause will not merely excuse, but even, in some cases, justify a capture. If there be probable cause, the captors are entitled, as of right, to an exemption from damages; and if the case be of strong and vehement suspicion, or requires further proof to entitle the claimant to restitution, the law of prize proceeds yet farther, and gives the captors their costs and expenses in proceeding to adjudication."

Section 4639 of the Revised Statutes contemplates that, under circumstances, all costs and expenses shall remain charged on the captured vessel though she be restored, and this court has repeatedly held that damages and costs will be denied where there was probable cause for seizure, and that sometimes costs will be awarded to the captors. *The Venus*, 5 Wheat. 127; *The Thompson*, 3 Wall. 155; *The Springbok*, 5 Wall. 1; *The Dashing Wave*, 5 Wall. 170; *The Sir William Peel*, 5 Wall. 517; *The Peterhoff*, 5 Wall. 28, 61, 62.

In *The Dashing Wave*, Chief Justice Chase said: " We think it was the plain duty of a neutral claiming to be engaged in trade with Matamoras, under circumstances which

warranted close observation by the blockading squadron, to keep his vessel, while discharging or receiving cargo, so clearly on the neutral side of the boundary line as to repel, so far as position could repel, all imputation of intent to break the blockade. He had no right to take, voluntarily, a position in the immediate presence of the blockading fleet, from which merchandise might be so easily introduced into the blockaded region. We do not say that neglect of duty, in this respect, on the part of the brig, especially in the absence of positive evidence that the neglect was wilful, calls for condemnation; but we cannot doubt that under the circumstances described, capturing and sending in for adjudication was fully warranted."

In *The Springbok*, the ship was restored but costs and damages were not allowed because of the misconduct of the master.

In *The Peterhoff*, payment of costs and expenses by the ship was decreed as a condition of restitution. The Peterhoff was captured by the United States vessel of war Vanderbilt on suspicion of intent to run the blockade and of having contraband on board. Her captain refused to take his papers to the Vanderbilt, and, in addition, papers were destroyed and a package was thrown overboard. The Peterhoff was searched, and it is stated in the opinion: "The search led to the belief on the part of the officers of the Vanderbilt that there was contraband on board, destined to the enemy. This belief, it is now apparent, was warranted. It was therefore the duty of the captors to bring the Peterhoff in for adjudication, and clearly they are not liable for the costs and expenses of doing so." The court then commented on the destruction of papers, and the throwing overboard of the package, in regard to which it was unable to credit the representations of the captain, but in view of the other facts in the case, did not extend the effect of the captain's conduct and the incriminating circumstances to condemnation.

The case before us falls plainly within these rulings. This vessel had gone into San Juan on July 4, although the captain had heard of the blockade at St. Thomas, but he says he had

not been officially notified of it; he telegraphed to the consul at San Juan to know, and was answered that they had received no official notice from Washington that the port was blockaded; he also heard while in San Juan that "it would be blockaded some future time, but that was not officially." The vessel was boarded and warned by the Yosemite on July 5, and the warning entered on her log. This imposed upon her the duty to avoid approaching San Juan, on her return, so nearly as to give just cause of suspicion, yet she so shaped her course as inevitably to invite it.

When the New Orleans succeeded the Yosemite her commander was informed of the facts by his predecessor, and knew that whatever the right of the Olinde Rodrigues to be in those waters, she could not lawfully place herself so near the interdicted port as to be able to break the blockade with impunity. But when he sighted her the ship was on a course to all appearance directly into that port, and steadily pursuing it. And when he signalled, the Olinde Rodrigues apparently did not obey, but seemingly persisted on her course, and that course would in a few moments have placed her within the range of the guns of Morro and of the shore batteries. In fact, when the shot was fired she was within the range of the Morro's guns. The evidence is overwhelming that she did not change her course until after the shot was fired, even though she may have stopped as soon as she saw the signal. The turning point into the Culebra or Virgin Passage was perhaps forty miles to the eastward, and while she could have passed the port of San Juan on the course she was on, it would have been within a very short distance. The disregard of her duty to shun the port and not approach it was so flagrant that the intention to break the blockade was to be presumed, though we do not hold that that was a presumption *de jure*.

The ship's log was not produced until three hours after she was boarded, and it now appears that the papers furnished the boarding officer, "said to be all the ship's papers," did not include two Spanish bills of health in which San Juan was entered as the vessel's destination. These were destroyed after the ship reached Charleston, and were, therefore, in the ship's

possession when the other papers were delivered. Had they been shown, as they should have been, can it be denied that they would have furnished strong corroboration of criminal intent? Or that their destruction tended to make a case of " strong and vehement suspicion "?

The entire record considered, we are of opinion that restitution of the Olinde Rodrigues should be awarded, without damages, and that payment of the costs and expenses incident to her custody and preservation, and of all costs in the cause except the fees of counsel, should be imposed upon the ship.

The decree of the District Court will be so modified, and

*As modified affirmed.*

MR. JUSTICE McKENNA dissented on the ground that the evidence justified condemnation.