## THE NEWFOUNDLAND.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF SOUTH CAROLINA.

No. 156. Argued November 3, 6, 1899. — Decided January 15, 1900.

The question in this case is as to the adequacy of the proof offered on behalf of the Government and the captors to show that the Newfoundland was trying to violate the blockade of Havana, and the court is of opinion that it does not attain to that degree which affords a reasonable assurance of the justice of the sentence of forfeiture in the court below — that it raises doubts and suspicions and makes probable cause for the capture of the ship and justification of her captors, but not forfeiture.

THE case is stated in the opinion of the court.

*W. Theodore G. Barker* for appellants. *Mr. G. A. R. Rowlings* was on his brief.

*Mr. Assistant Attorney General Hoyt* for appellee. *Mr. Joseph K. McCammon* and *Mr. James H. Hayden,* for the naval captors, were on his brief.

MR. JUSTICE MCKENNA delivered the opinion of the court.

The Newfoundland, a British steamship, was seized off the coast of Cuba on 19th July, 1898, by the United States ship of war Mayflower, on the ground that she was trying to violate the blockade of Havana. She was sent to Charleston, South Carolina, and there libelled with her cargo as prize of war. Testimony was taken *in preparatorio,* and the court determined it to be insufficient for condemnation; and on motion of the attorney for the United States ordered further proof.

Upon that proof a decree was entered condemning and forfeiting the ship and cargo, and they were ordered to be sold. From the decree this appeal is prosecuted. The assignments of error may be reduced to two contentions:

1. That the court erred in making an order for further proof because the testimony taken *in preparatorio* afforded no legal foundation for doubt, or proof of any overt act to justify the condemnation of the ship.

2. That the additional testimony taken still left the evidence insufficient for condemnation.

(1.) Of the testimony taken *in preparatorio* the court said:

"Taking the testimony which alone is now before the court, there is nothing in it which shows or tends to show that the Newfoundland, at the time of capture or at any other time, was heading for the port of Havana or any other port."

And further:

"So far as its examination has extended, no case has been found where a sentence of condemnation was passed upon such a state of facts as is presented in this record. How far

short the cases cited fall in showing cause for condemnation, the circumstances hereinabove recited demonstrate. These circumstances do no more than create a suspicion that there was an intention to enter a Cuban port in violation of the blockade; but suspicion, however well founded, is not proof, and cannot be accepted in any court in place of evidence.

"There must be some overt act denoting an attempt to do the thing forbidden, some fact in addition to the proved intention to commit the infraction, which shows that the unlawful intent is persisted in and is being carried into execution.

"As this court has in a recent case had occasion to remark, the testimony *in preparatorio* rarely affords opportunity for such proof. From the master's testimony it appears that Commander Mackenzie informed him that he had information, through a letter from the American consul at Halifax, that the Newfoundland sailed with intention to run the blockade. The court can form no opinion as to the probable weight of such testimony. It also appears that Commander Mackenzie thought the movements and conduct of the Newfoundland on the night of the capture suspicious. The court has personal acquaintance with Commander Mackenzie, and knows that in character, intelligence and attainments he is the peer of any officer of the navy; but, highly as it values his opinion, it cannot accept it in lieu of proof; it furnishes ground for ordering further evidence."

It is urged by counsel for appellants that the court, therefore, based its order for further proof upon Commander Mackenzie's opinion, which, even if otherwise competent, was not in evidence. We, however, do not so interpret the remarks of the court. It is explicitly stated that the circumstances created a suspicion of an intention on the part of the ship to enter a Cuban port, but that the suspicion was insufficient for condemnation without some proof in addition showing an overt act, which, as testimony *in preparatorio* rarely afforded, further proof was ordered.

This was not an abuse of discretion, and is clearly within the ruling of *The Sir William Peel*, 5 Wall. 517, 534. In that case the court said the preparatory proof, which con-

sisted of the depositions of the master of the ship, the mate and one seamen, "clearly required restitution" of the ship, and, declaring the rule, said, through Chief Justice Chase, that "Regularly in cases of prize no evidence is admissible on the first hearing, except that which comes from the ship, either in the papers or the testimony of persons found on board.

"If upon this evidence the case is not sufficiently clear to warrant condemnation or restitution, opportunity is given by the court, either of its own accord or upon motion and proper grounds shown, to introduce additional evidence under an order for further proof."

(2.) For a statement of the case we may quote from the opinions of the District Court. They clearly marshal and review all inculpating and exculpating circumstances, and give the impressions of the court of the character of witnesses the most important of whom testified in its presence. From the first opinion rendered on the testimony taken *in preparatorio* as follows: The Newfoundland "cleared from Halifax, Nova Scotia, July 8, 1898, for Kingston, Jamaica, and Vera Cruz, Mexico. She carried a cargo of flour, pork, corn, wheat and canned goods shipped by David Robertson & Co. Bills of lading were issued to them for 4386 packages for Kingston, and 3747 for Vera Cruz. These bills of lading are indorsed by them in blank. The charter party was for a voyage of three months to ports of the United States, West Indies, Central and South America, etc., in the customary printed form, and written therein was 'including open Cuban ports, no contraband of war to be shipped,' and was to terminate at Halifax. Musgrave & Co. were the charterers.

"It appears from the master's testimony that he was instructed by the charterers to follow the directions of the shippers of the cargo, and he received from Robertson & Co., through the former captain, verbal instructions to clear for Kingston and Vera Cruz, and to proceed with all haste to the north coast of Cuba, and to enter either the port of Sagua la Grande or Caibairien, but on no account to enter any

blockaded port, and if he found the ports of Sagua and Caibairien blockaded, to proceed to Kingston and wire for instructions. It seems clear from this testimony that it was the intention of the shippers that the cargo was to be landed at Sagua or Caibairien, where the master was instructed that he would be met by pilots, and that Kingston and Vera Cruz were 'contingent' or provisional destinations. Neither Sagua nor Caibairien were included among the Cuban ports in either of the President's proclamations notifying a blockade.

"The Newfoundland sailed from Halifax on July 9. Her speed is about eight knots; her registered tonnage, 567 tons. She steered for the 'Crooked Inland Passage' in the Bahamas. Passing thence into the 'Old Bahama Channel' and going in the direction of Sagua and Caibairien, she reached a point northwestwardly from Neuvitas, on the north coast of Cuba, where she was stopped by the United States ship of war Badger at 12.45 A.M. on Monday, July 18. Her papers were examined by the boarding officer, who informed the master that the whole island of Cuba was blockaded, and was allowed to proceed upon her course.

"The island of Jamaica lies almost due south from Neuvitas, which, being about two hundred miles from the eastern end of the island of Cuba, it is contended that the Newfoundland should at that point have changed her course and proceeded eastward around Cape Maysi and thence to Kingston. This, undoubtedly, would have been the shortest course, and if Kingston was the destination the sailing westward from Neuvitas would have carried the ship many hundreds of miles out of her course. It may be here observed that on the log book kept by the mate the line at the head of each page up to and including Monday, 18th July, is 'Journal from Halifax, N. S., towards Kingston and Vera Cruz.' On Tuesday, 19th July, the head line is 'Journal from Halifax, N. S., towards Vera Cruz and Kingston.' If after reaching Neuvitas there was an intention to go to Vera Cruz, the westwardly course would be the most direct."

From the second opinion on final hearing, as follows:

"Lieutenant Evans, in command of the U. S. S. Tecumseh,

testifies that about 5 o'clock in the afternoon of July 19, while on his station in the first blockading squadron, six or eight miles to the north and eastward of Havana light and about three and a half miles from the nearest shore, he sighted the Newfoundland moving towards him on a westerly course; that he immediately stood towards her at full speed, about ten knots, and overhauled her, sending his mate aboard to examine her papers. He estimates his position at the time as being latitude 23.15 north; longitude 82.13, and on a diagram prepared by the navigating officer of the Mayflower, and offered in evidence, he fixes her position as being unquestionably within a dotted circle; thinks that it was about the centre of the circle, but having taken no measurements at the time would not undertake to fix it closer than within three miles. He fixes the hour of boarding at 5.35, and says that he left her 'in the vicinity of 6 o'clock,' she bearing off on a course about west by half north. Mate Nickerson, of the Tecumseh, fixes her position at the time of sighting the Newfoundland at six to eight miles from Morro light and about three and a half to four miles from the nearest shore, the Newfoundland being at that time about nine miles to the northward and eastward, sailing west, the Tecumseh sailing about four miles to overhaul her. He fixes the hour of boarding at 5.35 exactly, and says that he returned aboard his ship about 5.50. He failed to enter upon the log of the Newfoundland the hour of boarding, as is usually and always should be done. He locates the point of boarding upon the diagram as does Lieutenant Evans; saw the Newfoundland for about ten minutes after she stood off one or two points to the north of west, and says 'it began to settle down dusk then.'

"Ensign Pratt, of the Mayflower, whose watch began at 8 o'clock, testifies that about 8.20 he picked up a small light bearing north by west from him; reported the same to the commanding officer, who ordered the ship headed for it north by west and the engines rung ahead full speed. Shortly after heading for it the light was lost, but, standing on the same course about twenty minutes and putting on forced draft, the light was picked up again a little to the westward. Altering

his course and heading north-northwest, the light shortly disappeared again. He gradually changed his course to the westward until he headed about northwest, standing on that course about thirty minutes, still not seeing the light, when, about 9.10, he sighted it again, bearing southwest on his port beam and inshore; headed for it again and stood on until about 9.30, when the light was seen outshore of him on his starboard beam, and headed for it again and came up with her at 10 o'clock. From subsequent developments it is clear that the light thus described was that of a lantern hanging on the wall of the companionway in the after deck-house of the Newfoundland, visible only when nearly abeam through the doors on either side. It would be open only to about three fourths of a point of the compass, and the Mayflower at full speed, making at times sixteen miles an hour, would pass the point of visibility, until by changing her course it would again become visible and be picked up, first on one quarter, then on the other. When the light was first seen the Mayflower was heading east-northeast and the light was bearing north by west from her, a point forward of the port beam, and estimated to be from two to three miles distant. No other lights were seen on the Newfoundland until she was overhauled. At that time all of the regulation lights were found to be burning brightly.

"Lieutenant Culver, navigating officer of the Mayflower, describes the chase substantially as above, and exhibits a tracing made on July 20, showing the estimated positions of the respective vessels at the time when the light was first discovered and at the time of the capture and the course sailed by each.

"Commander Mackenzie, of the Mayflower, was the senior officer of the blockade off Havana. The Mayflower covered about five points of the compass on the bearing from Morro light, and had been on that station during the month of July. He says that about 8.30 a faint light was reported about north by west of him, which he thought was a plain lantern. He describes the chase and locates the positions of the two vessels on the tracing prepared by Lieutenant Culver. From this

testimony and upon this diagram it would appear that. the Newfoundland when boarded by the Tecumseh was at a point within a circle whose centre is ten and three fourths miles from Morro light, whose bearing was southwest one half west.

"The testimony from the Newfoundland relating to the same matter will now be stated.

"Captain Malcolm, the master, says that he was boarded by the mate of the Tecumseh fourteen miles off shore — off the nearest land — while sailing on a westward course.; that the boarding officer, after examining his papers, advised him not to go any nearer the land lest he should get a shell into· him, and left him at 6.30; that thereafter he stood on a course one point north of west until 8 o'clock, when the Havana light bore about south by west, and from that time he put his ship back on a course due west, which he followed until boarded by the Mayflower.   He exhibits a chart, on which he has marked his course, and says that at 8.30 he passed Havana light, being seventeen and one half miles from it; that at 10 o'clock, when boarded by the Mayflower, he was twenty-one miles from Havana light, which bore then southeast by south half south.

"Salkus, the mate of the Newfoundland, testifies to the boarding by the Tecumseh at 6.10, and that the Havana light-house and Morro Castle were not visible; that they started on their course at 6.30, and at 8.30 were abreast of Havana light, which bore south about sixteen or seventeen miles.   In explana-tion of the entry in his log he says that he took no bearings at the time of the entry, and knew that the ship was farther off than ten miles.   He says that at the time of the capture Morro light was not visible from the bridge, but that he saw it from the compass pole, fifteen feet above the bridge.

"Payne, the engineer, testified to the boarding by the Te-cumseh at 6.10, and his log contains an entry showing that the engines stopped at 6.10 and started again at 6.30.

"It thus appears that there is a wide divergence in the tes-timony as to the point at which the Newfoundland was when boarded by the Tecumseh, and some divergence as to the time of such boarding.

"Lieutenant Evans and his mate fixed this location within

a circle whose radius is three miles. They say that they are certain as to her location within three miles, and believe that she was about the centre of that circle, which is ten and a half miles from Morro light. Captain Malcolm and his mate fix the location at a point twenty-four miles from Morro light, thirteen and a half miles from the centre of the circle above referred to, and ten and a half miles from that point of the circle nearest to the Newfoundland.

"There is a marked discrepancy, and the first point to be decided is which is correct. Applying the usual tests by which testimony is weighed — the intelligence of the witnesses, their opportunities for knowing the truth, the likelihood of error arising from considerations of interest, and other influences which commonly sway men's minds — there can be no doubt that there is a preponderance of probability in favor of that side which, having no interest in the controversy, has the greater opportunity of knowledge.

"Lieutenant Evans and his mate were on cruising grounds with which they were familiar. There could be no difficulty in ascertaining their position from the bearing of Morro, which was in plain sight day and night. They were within three or four miles of the shore, with well-defined objects from which bearings could be had. It was their manifest duty to know where they were, for they had to keep within certain prescribed limits. They are men of education, character and intelligence, and their testimony cannot be discredited without imputing to them a reckless carelessness for which there is no warrant.

"Neither Captain Malcolm nor his mate were familiar with the locality; the former had once before been to Havana; the latter, never. Their interest is obvious. I have no difficulty in coming to the conclusion that the preponderance of evidence fixes the position of the Newfoundland within the described circle when boarded by the Tecumseh. I am not so clear as to the time. The mate Nickerson fixes it at 5.35 precisely, and says that he returned to the Tecumseh at 5.50, but he says that he watched the Newfoundland for about ten minutes after she left, when 'it began to settle down dusk.'

"The sun set in that latitute on that day about 6.30, and there is little twilight.

"The officers of the Newfoundland fix the hour of boarding at 6.10 and the time of departure at 6.30, and these figures are entered upon the engineer's log. This log has been in possession of the claimant since the capture, and some erasures appear in another part which may hereafter call for comment, and it therefore cannot be accepted as absolute verity; but giving the ship the benefit of the reasonable doubt which the testimony warrants, assuming that she sailed at 6.30, she is next seen by Ensign Pratt about 8.20, when he sighted a small light bearing north by west from the Mayflower, whose station on the cruising ground lay next west of the Tecumseh, and whose position at that time was about six miles north by west from Morro light. This small light was estimated to be about two or three miles from the Mayflower. The mate of the Newfoundland made this entry upon her log: '8.30, Havana light bearing south ten miles.' If this testimony is taken as true, this would place the Newfoundland at a point seven miles from the centre of the circle adopted as the point of departure, and ten miles from the extreme western circumference of it, and it would follow that she had consumed two hours in making that distance. As her speed during her voyage was on an average nearly eight knots an hour, there is a considerable margin of time to be accounted for, which she endeavors to do by fixing her location at 8.30 at a point seventeen miles from Havana. This is the testimony of her master, and the mate concurs in it, saying that the entry in his log was not an accurate statement of the ship's position at that time; that it was only intended to show that she was at least ten miles from Havana light. It is not necessary to discuss nor decide now how far a ship is concluded by the entries in her log. If the party making such entry is shown to have been drunk at the time or habitually careless, or if made in a perfunctory way, without observations or the opportunity of observation, little weight might be given it; but the log being intended to be a correct record of the facts contained therein, an entry made with full knowledge and opportunity of ascer-

taining the truth must be accepted as the truth if it tells against the party making it, and can be denied no more than a deed. If it is the result of a mistake, there must be conclusive evidence of the mistake. It is sufficient to say that such evidence has not been adduced here, and the entry upon the log, confirmed as it is by the testimony from the May-flower, fixes the position of the Newfoundland at 8.30 at a point about ten miles from the Havana light. From that point to the point of seizure her course can be marked with sufficient accuracy. That she sailed on a straight course from 8.30 to 10 o'clock, and that such course led her away from the entrance into the port of Havana, is entirely clear, whether the point was seventeen miles from Morro light, as claimed by the Mayflower, or twenty-one miles, as claimed by the Newfoundland, or eighteen miles, as agreed upon by her master and Ensign Pratt as the point from which they took their departure after the seizure, when they started upon their voyage to Charleston.

"The next incriminating charge is that the Newfoundland was sailing without lights. Ensign Pratt, who first sighted her, says he picked up a small light. All the witnesses from the Mayflower describe this light as that from an ordinary lantern, and not the masthead light. None of these witnesses saw any of the regulation lights until they came up with her, about 10 o'clock, when they were all brightly burning. After the chase began these regulation running lights, being visible only two points abaft the beam, would naturally not be seen.

"Coming westward from the point where she left the Tecumseh to the point where the faint light was sighted, her masthead light, whose visibility by the regulations is at least five miles, should certainly have been seen if there was proper vigilance aboard the Mayflower. That Ensign Pratt was vigilant is demonstrated by the fact that he picked up the dim light two or three miles off at 8.20. He went on duty at 8 o'clock. The officer who had the watch before that hour was not examined, nor were the lookouts, who are described by Commander Mackenzie as uncommonly efficient men. As it is, the testimony leaves this question open to reasonable

doubt. While it is probable that the masthead light, if burning and not screened, would have been visible to Ensign Pratt at the time he descried the small light, he does not say with certainty that it would have been, there being but a narrow limit of visibility.

" The witnesses from the Newfoundland, including the sailor who lit them, all testify that the lights were lit at the usual hour and they were all burning when she was overhauled.

" Commander Mackenzie and other witnesses from the Mayflower all testify that the small light already described was the only one seen ; that there were no stray lights, such as are commonly seen aboard a steamer in the night time.

" Taking the point of departure to be somewhere within the circle already described and the time of departure at 6.30 and the rate of speed at nearly eight knots, and following the courses described — west by north until 8 o'clock, and then due west until 10. o'clock — and plotting it upon the chart, I must conclude that she would have been some miles farther west than either the point claimed by her or the point testified to by the officers of the Mayflower as the point of capture at 10 o'clock, unless she had loitered somewhere upon her route.

" Outside the domain of the exact sciences, absolute certainty is rarely attainable, and there must always be an element of doubt as to every transaction the proof of which rests upon fallible human testimony, nowhere more fallible than in estimates of location and distances upon water.

\*          \*          \*          \*          \*

" We will now look into the character and conduct of the Newfoundland to see whether her presence off Havana is consistent with innocent intent.

" She is a small steamship, lately employed in the sealing business. She sailed from Halifax, July 9, loaded with a cargo of provisions, under command of Captain Malcolm, who was employed for that voyage. She had two clearances, one for Kingston and one for Vera Cruz. Commander Mackenzie testifies that it is not the practice of any American custom house to give two clearances. Captain Malcolm says that this

is not unusual in Halifax, and that he has generally had separate clearances for separate ports, sometimes five or six, whenever he had cargo for each. We have no statute prescribing any regulation on this subject, and wherever a ship has separate cargo for separate ports I can see no reason why she should not have a clearance for each, and I am informed that it is the custom at this port to give such separate clearances. While I cannot hold that separate clearances for Kingston and Vera Cruz were in themselves suspicious, it is a cause of grave and just suspicion that her real and primary destination was to neither of those ports, as subsequent events proved. Captain Malcolm, in his testimony *in preparatorio*, said that his verbal instructions were to sail for Caibairien or Sagua la Grande, and if those ports were blockaded to go to Kingston and cable for orders. For reasons, into which it is not the province of this court to inquire, neither Sagua nor Caibairien were included among the ports blockaded under the proclamation of the President, and he had the right to go to either. Whether in so doing without proper clearances he would have incurred penalties under the municipal regulations of Great Britain or of Spain is not within the scope of this inquiry, certain it is that he would have committed no offence cognizable here.

" Taking his course to the southward, he next appears off Neuvitas, where he is boarded by Lieutenant Titus, of the U. S. S. Badger, and is informed by him that the whole coast of Cuba is blockaded. The case is not presented in an aspect which requires any determination of the question whether that sort of a blockade was effective or legal, as he did not go to either Sagua or Caibairien for the purpose of testing its validity, which he might well have done. According to his testimony *in preparatorio*, and it is repeated on this hearing, he abandoned all thought of entering either of those ports upon hearing that they were blockaded. His course, then, should have been around the eastern end of the island of Cuba to Kingston, by way of Cape Maysi, for the course around the western end, by Cape Antonio, was nearly a thousand miles further. In these days of sharp competition intelligent

men do not make such long detours in the prosecution of legitimate business. The explanation given is that he wanted to satisfy his charterers by showing them that he had passed by the port to which he was directed to go, and, further, that he apprehended that he would subject himself to suspicion by changing his course at that time. The answer to this is obvious. His charterers did not instruct him to go by the ports of Sagua and Caibairien, but to go to them, and if he did not intend to do that his proceeding in that direction was such a futile, time-consuming and coal-consuming venture that it staggers credulity to accept it as the true reason; nor does the other reason given seem much more satisfactory. There was nothing unlawful in his setting out for Sagua or any other open port in Cuba, and if, after information of the blockade, it became necessary to change his course in order to go by the shortest route to Kingston, his contingent destination, there would have been no risk in disclosing the truth. In this, as in most of the affairs of life, the straightforward course would have been the wisest course. That it was not taken suggests the conclusion that neither Sagua nor Caibairien was the real destination. It appears from the testimony that neither at the time of capture nor afterwards was anything ever heard about Sagua or Caibairien until it came out in the examination of Captain Malcolm before the prize commissioners. None of the other officers of the ship appear to have known about it. The mate seems to have thought that they were going to Vera Cruz. In the engineer's log there appears every day from July 9th to July 18th, inclusive, a line at the top of the page containing the words, 'from Halifax to Vera Cruz and —— Cuba.' The word ·'Kingston' is written over and partially obliterat , the word ' Cuba.' There is a blank space before the word ' Cuba,' evidently intended to be filled in. 'Havana' would about fill it. The engineer appeared to be the most intelligent man on the ship after the master. From the entry on his log it is plain that he knew that the ship's destination was Cuba, and there would seem to be no good reason why the name of the port should have been left blank if it was Sagua or any other open port. In the

absence of any testimony confirming the master's statement that his instructions were to go to Sagua or Caibairien, and there being nothing in his conduct showing that that was his real destination, I must hold it to have been a pretensive destination, and his appearance before Havana is therefore not satisfactorily explained.

"Lieutenant Culver, of the Mayflower, who boarded her, says that when he asked Captain Malcolm where he was bound he was very vague in his replies, sometimes saying Kingston and sometimes saying Vera Cruz, and when asked whether he was shaping his course by way of Cape San Antonio he replied that he hadn't made up his mind. In the same conversation he said that he had been making eight knots an hour from the time he was boarded by the Tecumseh to time of overhauling. To Commander Mackenzie, on the Mayflower, he said he was making for Vera Cruz, if he had coal enough, and then to Kingston. If he did not have enough coal, he was going to Kingston in order to take on coal. To Lieutenant Pratt, the prize master on the voyage up to Charleston, he said that he was bound for Vera Cruz.

"Captain Malcolm says, in his testimony, that his instructions were to go to Kingston if he found the ports of Sagua and Caibairien blockaded, and from there he was to cable for instructions, and that Kingston was his destination; that he had plenty of coal to get to Kingston, but not enough to go to Vera Cruz and then Kingston.

"It must be conceded that there is no proof of any attempt to enter the port of Havana — that is to say, no witness has testified to seeing her heading that way. It must also be admitted that the testimony as to loitering falls very far short of the proof offered in the Neutralitet, the Apollo, the Charlotte Christine, the Gute Erwartung, the cases relied on by the government."

The application of a more stringent rule to the Newfoundland than was applied in those cases was justified by the court on the ground that steam vessels have greater power of eluding blockades than sailing vessels possess.

The conclusion of the court was that the evidence estab-

lished that the ship was loitering about the coast seeking an opportunity to violate the blockade. Conceding, *arguendo*, that this was enough for her condemnation, we think the fact is very disputable. It is based upon the ship's nearness to the coast, the slowness of her movements deduced from her position when the Tecumseh boarded her and when the Mayflower captured her, and the taking of a longer route to Kingston than might have been selected.

These circumstances may be explained consistently with innocence. Against them the fact remains that she made no attempt to enter any Cuban port. She sailed by Caibairien. She sailed by Sagua, although a railroad connected it with Havana, and made it inviting to contraband enterprise. And she had sailed beyond Havana when she was captured. But it is argued she must have loitered, and with guilty intention because she ran only twelve miles in three hours, when she ought to have run twenty-four miles.

In this conclusion there are disputes of fact as well as disputes of inference. It depends upon the time it was and where she was when the Tecumseh boarded her — the time it was and where she was when the Mayflower seized her; and granting a decision of these as contended for by the Government, there are the elements of a varying course in the night and the retarding influence of the current to account for the time.

The fact of going around Cuba to Kingston instead of turning back after she was boarded by the Tecumseh, is from our present view not completely accounted for. But our situation, it must be remembered, was not Captain Malcolm's situation. It was his view, he testified, of his duty to his employers. It was his way to avoid exciting the suspicion of the officers of the Tecumseh; and, in another place, without peril or responsibility for that or some other decision, we are not prepared to say that it is necessarily proof of guilt. After experience it is often easy to see that something else should have been done than that which was done, but judging Captain Malcolm in his situation, was there not presented to him a fair conflict of reasons? It is very certain, if doubt came to him what

to do, he would avoid the hazard of the seizure of his ship at the comparatively small sacrifice of the coal and time which would be consumed by going to Kingston the longer way.

It is further urged that when the Newfoundland was seen and pursued by the Mayflower she had not her usual lights displayed. This, the District Court said, the testimony left in reasonable doubt. "While it is probable," it was said, "that the masthead light, if burning and not screened, would have been visible to Ensign Pratt at the time he descried the small light, he does not say with certainty that it would have been, there being but a narrow limit of possibility." The limit was as narrow to all other officers of the pursuing vessel and the possibilities it afforded must be considered as at least balanced by the positive testimony of all on board of the Newfoundland, including the sailor who lit them at the usual hour, and the fact that they were all burning when she was overhauled.

But it may be said that the ship has too many suspicious circumstances to account for, and that we overlook the probative strength arising from their number and their concurrence; that if each one standing alone can be explained, all together unerringly point to the guilt of the ship. We appreciate the force of the argument, but cannot carry it so far. And yet we have no desire to impair the effectiveness of blockades by declaring a more indulgent rule than that of prior cases nor permit experiment with opportunities to break into blockaded ports. But there should be some tangible proof of such intention — a more definite demonstration than this record exhibits. As we have already seen, the learned trial judge was constrained to say "that the testimony as to loitering falls very far short of the proof offered in the Neutralitet, the Apollo, the Charlotte Christine, the Gute Erwartwig, the cases relied on by the government. Their application, however, to the case at bar, whose facts "fall far short" of their facts, is insisted on because of the difference between the power of steam vessels and the power of sailing vessels. Undoubtedly there is a difference, but if steam has increased the power of blockade runners, it has increased in greater degree

when conjoined with the range of modern ordnance, the power . of blockade defenders. We recently had occasion to .consider their power, and decide that a single modern cruiser might make a blockade effective. *The Olinde Rodriguez,* 174 U. S. 510.

The question in this case, then, is as to the. adequacy of the proof, and we do not think it attains that degree which affords a reasonable assurance of the justice of the sentence of for-. feiture. It raises doubts and suspicions — makes probable cause for the capture of the ship and justification of her captors, but not forfeiture. *The Olinde Rodriguez, supra.*

> *It follows, therefore, that the decree of the District Court must be reversed and the cause remanded, with directions to enter a decree restoring the vessel and cargo, or if they have been sold, the proceeds of the sale, but without damages or costs, and it is so ordered.*