## Case No. 5,328.

### The GEORGE.

### [1 Mason, 24.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1815.

PRIZE—JUSTIFICATION FOR CAPTURE — FALSE AND SIMULATED PAPERS—GOOD FAITH OF CAPTORS.

1. Probable cause is a sufficient justification for a capture. But such protection may be forfeited by subsequent misconduct or negligence. What constitutes probable cause.

[Cited in The La Manche, Case No. 8,004; Averill v. Smith, 17 Wall. (84 U. S.) 92.]

2. Effect of false and simulated papers.

3. Captors are bound to good faith and ordinary diligence; and are therefore liable for ordinary negligence.

4. To constitute probable cause for capture, it is not necessary that there should be prima facie evidence to condemn. It is sufficient if there be circumstances, which warrant a reasonable suspicion of illegal conduct.

[Cited in Brissac v. Lawrence, Case No. 1,888; Gala Plaid, Id. 5,183; The La Manche, Id. 8,004; The Isabel Thompson v. U. S., 3 Wall. (70 U. S.) 162.]

[Appeal from the district court of the United States for the district of Massachusetts.]

This was a case of an American ship, captured by an American cruiser, and afterwards recaptured by the British, and condemned in their courts. The owners proceeded against the captors for restitution in damages, alleging the capture to be illegal, and that the captors, by sundry irregularities, had forfeited the protection otherwise indulged them by the law.

Mr. Prescott and A. Townsend, for libellants.

Sprague & Pitman, for captors.

Mr. Townsend cited 2 Valin, Comm. 270; Azuni, c. 3, art. 4, §§ 2. 4, 5, note 193; Bynk. per Dupon. 3; Purviance v. Angus, 1 Dall. [1 U. S.] 184; Maley v. Shattuck, 3 Cranch [7 U. S.] 458–488; 1 C. Rob. Adm. 95; 3 C. Rob. Adm. 129; 6 C. Rob. Adm. 316. For the captors were cited The Maria, 4 C. Rob. Adm. 348, 350; The Anna Catharina, Id. 110, 111; The Lively [Case No. 8,403].

STORY, Circuit Justice. This is a libel for damages for an alleged illegal capture of the brig George and cargo by the private armed ship Orlando, Babson commander. The brig was captured on the 9th of February, 1815, about the latitude 39° or 39° 30″ N., and longitude 69° 30″ or 70° W., and ordered to the United States for adjudication; and afterwards, on the 16th of the same month, was recaptured by the British, and carried into Halifax, and there, together with her cargo, condemned as lawful prize. The cargo on board, at the time of the capture, consisted of cotton, rice, molasses, tar, and reeds; and the brig purported to be on a voyage from Georgetown

1 [Reported by William P. Mason, Esq.]

(S. C.) to New Bedford, (Mass.) The testimony in the cause as to the conduct of the captors, as well at the time of the capture as afterwards, is very voluminous, and it is not necessary to be minutely stated. There is no controversy, that the brig and cargo were owned by the libellants, who are American citizens.

The principal questions made at the argument are: 1. Whether there was probable cause for the capture. 2. If there was, whether the protection was not forfeited by the subsequent misconduct and negligence of the captors in the navigation of the prize.

Before I proceed to the consideration of these questions, it may be proper to dispose of a preliminary objection taken to the conduct of the captors at the moment of capture. It is admitted, that a belligerent has a right to search every vessel found upon the high seas, in order to ascertain her national character and conduct; but in respect to neutrals, the search is to be conducted with as little trouble and vexation as possible. In the present case, the commander of the Orlando fired a shot in the first instance, to compel the George to round to; and ordered the master [Almy] to bring his papers on board the privateer for examination. In strictness of law it may perhaps be true, that belligerents have no right to compel neutrals to bring their papers on board of the searching ship; and that the search is to be made by the belligerent on board of the neutral; and all that the latter is obliged to do, is to act frankly and fairly in the disclosure of his papers and voyage, and to offer no resistance to a complete and thorough examination of his vessel and cargo. It may, therefore, be an irregularity to compel a neutral, under the terror of superior force, to leave his own ship, and submit to examination and search elsewhere. And perhaps, if not strictly required by the law of nations, it would comport best with the common rules of courtesy and amity between nations, not to fire a shot, until the vessel had been, by some previous signal, required to heave to, and had refused. Assuming, however, these principles to be correct, (in respect to which I do not decide,) still these are, after all, but irregularities in the exercise of a known right, and so common, and I had almost said universal, in practice, that the correct principle, if it exist, as stated, seems almost wholly lost sight of. And I do not know, that any penalty has ever been attached to such irregularities; although, perhaps, in a case of gross irregularity, attended with immediate and serious injury and damage to the parties, it might not be unfit to entertain a claim for remuneration before the proper prize tribunal.

To return to the principal questions; it is asserted by the counsel for the libellants, that to constitute a probable cause of capture, the circumstances of the case must be such, as prima facie, and standing alone,

would furnish a good ground of condemnation; or that, if this be not correct, the most indulgent rule is, that it should be a case of such doubt, as to call for farther proof at the least; and that, if a court of prize would restore without farther proof, it would be conclusive evidence of a defect of probable cause. In support of these positions, the cases of Murray v. The Charming Betsy, 2 Cranch [6 U. S.] 64, and Maley v. Shattuck, 3 Cranch [7 U. S.] 458, have been relied on as authorities. Upon a careful examination, these cases will not be found to warrant any such positions. Nor have I been able to find such a doctrine asserted in any elementary work or prize report. There can be no doubt, that where there is prima facie evidence to condemn, or so much question and difficulty, as to require farther proof, the captors are completely justified. But that these are the only tests of a probable cause for the capture, I am by no means prepared to admit. In Locke v. U. S., 7 Cranch [11 U. S.] 339, the supreme court held, that the terms "probable cause," according to their usual acceptation, meant less than evidence, which would justify condemnation, and in all cases of seizure, have a fixed and well known meaning; that they import a seizure made under circumstances, which warrant suspicion. In my judgment, the terms must receive the same exposition in reference to matters of prize. If, therefore, there be a reasonable suspicion of illegal traffic, or a reasonable doubt as to the proprietary interest, the national character, or the legality of the conduct, of the parties, it is proper to submit the cause for adjudication before the proper prize tribunal; and the captors will be justified, although the court should acquit without the formality of ordering farther proof. The St. Antonius, 1 Act. 113.

The circumstances relied on by the captors, to justify their conduct in the present case, are, 1. that the vessel had no log-book on board; 2. that an artificial leak was then in operation, to deceive the captors; 3. that a British license was found on board in possession of one of the charterers, which was not produced until a personal search was made on him; 4. that there were a simulated register, sea-letter, and log-book, and false shipping articles on board, pointing altogether to a fictitious foreign voyage; 5. that the brig was out of her proper course for the port of New Bedford. The absence of a log-book is certainly an unusual occurrence, even in coasting voyages, in this part of the country. But it is now shown by the evidence in the case, not to be unusual in coasting voyages from New Bedford. It is an important document, and the only one, which to a visiting cruiser can truly show the nature and course of the voyage, and explain any apparent deviation from the asserted destination. However, therefore, it

might be in time of peace, a prudent master would hardly choose in time of war to hazard any thing by the want of such a customary document. There was, moreover, a false log-book on board, purporting to have been kept on a foreign voyage, immediately connected with or preceding the present. This circumstance was calculated to increase the suspicion excited by the absence of a genuine log-book. However, on this circumstance alone, no great stress has been laid.

The British license was signed by Lord Sidmouth, dated on the 12th of September, 1812, and to remain in force during nine months. It authorized any vessel, not French, to import into the port of Cadiz, from any port of the United States, a cargo of grain, flour, meal, or rice, notwithstanding the vessel and cargo might belong to a citizen of the United States, and permitted the master to receive his freight, and return with his vessel and crew to any port not blockaded. Upon this license was the following indorsement: "The brig George of New Bedford, burthen one hundred and seventy-two tons, Jacob Almy master, has cleared at New York for Cadiz, with a cargo of corn and flour, this seventh day of May, 1813." The simulated sea-letter, the seal of which was in fact genuine, and the shipping articles, purported to be for the same voyage. Upon the same shipping articles there was a memorandum, dated the 13th of September, 1813, at Lisbon, and purporting that the George had arrived there in distress on her voyage from Cadiz to New Bedford, and had been condemned as unseaworthy, and that her crew had been upon that account discharged there, and this memorandum purported to be signed by the American vice consul. There was another memorandum on the same paper, which was actually signed by the crew on board of the George at the time of the capture, agreeing "to go from the port of Lisbon to Amelia island, there to be discharged," and the spurious log-book applied to this latter voyage, beginning the 6th of October, and ending the 18th of November, of 1814. There is some contrariety of evidence as to there having been a simulated register on board, though a considerable weight of testimony is in favor of the allegation. In my view of the case, it is quite immaterial, whichever way this fact is settled. There was on board, a genuine enrolment of the George for the coasting trade, granted at New Bedford, in February, 1812; and a license pursuant thereto for one year from the 11th of November, 1814; and also a manifest and clearance of the vessel and cargo at Georgetown (S. C.), in January, 1815, and sundry letters respecting the shipments. Here, then, there were false and genuine papers, mixed up together; and the question is, whether the captors were bound, at their peril, to unravel the fraud, and to trust to the explanation of the parties on

board, or had a right to submit the whole to the scrutiny and decision of a prize tribunal.

As the George was licensed for the coasting trade, it was illegal for her to engage in any foreign voyage or trade whatsoever, under the penalty of confiscation of vessel and cargo. And, if the fact of such illegal traffic were clearly established, it would not only have justified the capture, but, upon principles well settled, would have drawn after it a condemnation of vessel and cargo in the prize court. It is a well known rule, that though municipal forfeitures are not directly enforced in courts of prize; yet as no claim can be there sustained, which is tainted with illegality, they are indirectly enforced in a manner fatal to the supposed rights of the party with reference to the mere question of prize. Was there not, then, from the papers, a reasonable cause of suspicion, that the vessel had, since her enrolment, been engaged in a foreign voyage at Cadiz, and at Lisbon? Some of the papers explicitly avow the fact; and how were the captors to know, which were genuine, and which were spurious? It has been emphatically said, "that if neutrals will weave a web of fraud, a court of prize will not take the trouble of picking out the threads for them, in order to distinguish the sound from the unsound." The Eenrom, 2 C. Rob. Adm. 8. And it would be perilous indeed, if captors were bound to decide upon the integrity and genuineness of every contradictory paper submitted to them, under the penalty of responsibility in damages for a mistake.

Farther, it is argued that the British license could furnish no ground for reasonable suspicion of illegal traffic, because it appeared upon the face of it to have expired long before the period of capture. Let us examine this argument in connexion with the circumstances of the case, and the principles of law applicable to this subject. Whatever may have been the case formerly, it is very clear that the British courts now construe their licenses with great liberality, both as to time and objects. It is a general rule, that where no fraud has been meditated or committed, and the parties have been prevented from carrying the license into literal execution by a power, which they could not control, they shall be entitled to the benefit of its protection, although the terms may not have been literally and strictly fulfilled. And, therefore, it has been held, by very high authority, that if the license has expired, and the parties can show, that they have used due diligence, but have been prevented by accidents or obstacles not within their control from carrying their intentions into effect within the time limited by the license, they shall still be held within its protection. The Goede Hoop, 1 Edw. Adm. 327. With these principles in view, we shall find, that the sole object of the simulated papers was, to give a coloring to the case, that should entitle the ship-owners to avail themselves of the plea, that the non-compliance with the literal requisitions of the license arose from superior force and unavoidable accident. And if such necessity or accident had intervened, what was there incredible in the supposition, that the brig was returning from Lisbon to New Bedford, by a circuitous route, warranted by the objects of the voyage, viz. by the way of Amelia island and Georgetown? And if such voyage had been actually performed, it would have been somewhat difficult to exempt the vessel and cargo from that penalty, pronounced by the law upon all property, sailing under the passport or license of the enemy.

But it is said, that the contrivance was too inartificial, and the coloring too thin and slight, to deceive any, even the most credulous persons; and that the captors could not but have seen through the disguise. It is somewhat singular, that such a suggestion should come from the parties, who fabricated the contrivance, and gave it, for the purposes of deceit, its primitive coloring. The very explanation now offered to the court is, that it was to be used for the purpose of deceiving the enemy, on the outward voyage from New Bedford to Georgetown. And if it would have deceived British cruisers on the outward voyage, it is somewhat difficult to perceive, why it might not have equally passed for genuine with American cruisers on the homeward voyage. In any view, this suggestion does not come with a very good grace from the libellants. It somewhat resembles the case of an artisan crying down his own manufactures. It is said that all these contradictory appearances were explained, or offered to be explained, by the master to the captors. But I am not aware of any rule of law, that requires captors to rest satisfied with mere verbal explanations of gross contradictions in written documents. What security could they have, that the explanations were not a part of the concerted plan of deception? Nor was the conduct of the master, and other persons on board, at all calculated to do away with any suspicions arising from the papers. The artificial leak, the attempt to bribe, the absence of the log-book, the apparent deviation from the most usual route of the voyage, and the withholding of the British license until a compulsory search, were facts of themselves not without some significancy in deciding on the integrity of the transactions. It is also material, that the simulated papers were not produced by the master; but were found upon the person, and in the trunk, of Mr. Leslie, who called himself a passenger, and denied having any papers, but who in fact was a joint charterer of the vessel, and part owner of the cargo. Nor was a second British license, dated the 14th of April, 1814, and granted by Sir James Saumarez, ever produced or admitted to exist by the master. It was found on board by the prize master, after the vessel had been taken possession of

·as prize. This license authorized an importation, in an American vessel, of wheat, grain, tar, &c., from the United States into St. Andrews and St. John's in New Brunswick, and though by its own limitation it had expired, it could not but have had a tendency to inflame every other suspicion. If it were necessary, I am not aware, that it is not now competent for the captors to avail themselves of any legal cause of suspicion or of condemnation, which is presented by the papers, although such cause might not have been known at the time of capture.

It is not, however, in my judgment, necessary to resort to this special ground. It is a clear principle of the law of nations, that a ship must, in time of war, be provided with complete and genuine papers; and if there be false or colorable papers on board, touching the voyage, the captors have a right to bring her in for adjudication. Duke of New-Castle's Letter, Coll. Jurid. 129; Wheat. Mar. Capt. Append. 317. They are not bound, at their peril, to judge of the degree of guilt or innocence of the party, nor to decide as to the truth of verbal explanations of serious difficulties by the captured crew. It is undoubtedly allowable to use stratagems to deceive the enemy; but if these stratagems may also deceive friends, it is at the peril of those, who use them, and not those, who may have been betrayed into a mistake by their existence. Supposing even, that the counsel were right in their law, (which is not admitted) that to justify a capture, the case must be of such doubt as to require farther proof, it seems to me difficult to conceive, how it could be possible for any court, consistently with principle, to dispense with the production of such proof under the circumstances of the present case. The proofs, now offered, afford a satisfactory explanation; but it should be remembered, that these proofs are such, as could not have appeared upon an original hearing as prize. In my judgment, therefore, there was probable cause for the capture; and the suspicions of illegal traffic were reasonable, so as to give the benefit of the title of a bonas fidel possession to the captors.

The next question is, whether the captors have, by their conduct, forfeited the protection afforded by that title. The law is clear, that a bonae fidei possessor is not responsible for casualties; but he may, by subsequent misconduct, forfeit the protection of his fair title, and render himself liable to be considered as a trespasser from the beginning. The Betsey, 1 C. Rob. Adm. 93. But it is not every irregularity that will produce this effect. It must be such as produces an irreparable loss, or at least the very damage, for which compensation is sought from the court. It has been said, by the counsel for the libellants, that the law exacts from captors more than ordinary diligence; that the possession by capture is against the will of the owners, and is strictissimi juris; that it

does not therefore come within the general doctrine as to bailments; but the possession being by force, the party is bound to extraordinary diligence, and is punishable for slight neglect. The authority relied on (The William, 6 C. Rob. Adm. 316) certainly does not authorize any such conclusions. Sir W. Scott, in the case alluded to, was answering an objection of another sort, viz. that captors were bound for such care only, as they would take of their own property, which, with great propriety, he denies, and asserts the rule to be, that they are responsible for due diligence. And it is obvious, that by "due diligence" he understood such diligence as a prudent and discreet man would exercise about his own affairs, which is precisely the legal definition of ordinary diligence. This construction is corroborated by other decisions of the same learned judge, and particularly, by that in The Maria and Vrow Johanna, 4 C. Rob. Adm. 348. See, also, The Carolina, Id. 256; The Catherine and Anna, Id. 39. Nor am I able to distinguish the case, upon principle, from that of a bailment beneficial to both parties, where, of course, the captors would only be held responsible for ordinary neglect.

It is farther argued, that in the present case there was a want even of ordinary diligence. Various circumstances are relied on for this purpose, which I will now proceed to consider. In the first place, it is alleged, that the prize master was not a person of sufficient skill, and did not prosecute the voyage with all due diligence. I do not think, that this objection is sustained in point of fact. Independent of the natural presumption from his station, there is the direct testimony of a gentleman, perfectly conversant in affairs of this nature, in his favor. It is intimated, that he was not always temperate; but no delay or injury is shown to have arisen from this circumstance, even if its existence be completely established. From the manner too, in which the charge is made by the witnesses, I do not think, that this was a frequent or serious occurrence; and it has been very justly remarked, that in a mode of life peculiarly exposed to severe peril and exertion, something of indulgence is to be allowed, and that slight acts of this nature afford no conclusive proof of disability for general maritime employment. The Exeter, 2 C. Rob. Adm. 261.

In the next place, it is alleged, that the master and Mr. Leslie ought to have been allowed to remain on board to assist in the navigation of the vessel. Without adverting to their conduct at the time of the capture, it is a sufficient answer to this objection, that it is founded upon a misconception of the law. Captors are not permitted to take out the whole of the captured crew, and indeed ought to allow the master, or some of the principal officers, to remain on board. And the prize court will animadvert with severity upon any unnecessary deviation from this

salutary practice. But the rule has no reference to the navigation of the ship; it is adopted with a totally different view. It is to prevent embezzlements and frauds, and to bring before the prize court, to answer upon standing interrogatories, persons, who, from their stations and privity with the owners, can speak to the national character and proprietary interest of the ship and cargo. The captors are not bound to allow the captured crew to navigate the ship; nor are the latter bound to perform such duty. They may agree so to do, and in such case will be held to their agreement; but, if no such agreement be made, the captors are bound to put on board a sufficient crew to navigate the ship, and are responsible, if any damage happen from their neglect in this particular.

It is, in the next place, alleged, that there was no time-piece on board, to regulate and ascertain the course of the ship. It does not, however, appear, that any inconvenience or embarrassment arose from this omission. The vessel was so near the coast, and the soundings and course of the voyage so well known, that it is highly probable no importance was, at the time, attached to this circumstance. And it is somewhat singular, that so usual and customary an instrument as an hour-glass, was not on board belonging to the brig. It is sufficient, however, that there is no evidence, that the capture by the British was occasioned by this defect.

In the next place, it is alleged, that there was negligence in not putting on board a prize master, who was a good pilot for all the harbours on our coast; and that there was negligence in the prize master in not going into Portland or Portsmouth, instead of attempting to reach the port of Gloucester. But no such general knowledge of pilotage can surely be required or expected. For most of the important ports on the coasts, regular or occasional pilots exist, and particularly for the ports above mentioned. · It is therefore sufficient, if the prize master has reasonable skill in navigation, and knowledge of the position of the coast, so as to make a good harbour, or avail himself of the proper pilot; and there is no reason to impute to the present prize master, a deficiency of this skill. Nor am I aware of any compulsive obligation upon a prize master to go into the first port, that presents itself, even if it be practicable. The laws of the United States contemplate, that captors have a right to remove prizes from one district to another, even after they have arrived at a port of safety. It would certainly be harsh to require, that a prize should be carried into the first port, which presents, however inconvenient to the parties, or remote from the scenes of their business. From the very nature of things the prize master must have a right to exercise a reasonable discretion in such cases; and if he exercise his judgment fairly, and no known and imminent danger require a different course, it seems to me

the law will protect him, although in the event it may turn out, that the port selected by him was not the best, and that a loss might have been prevented by a different choice.

In the case at bar, it is not satisfactorily made out in evidence, that the prize master was guilty of delay or mismanagement in the conduct of the voyage, or in the selection of a port. He appears to have acted with good faith; and the port of destination, if not the best, was certainly a safe and proper one. These are the material circumstances, from which a want of ordinary diligence has been attempted to be inferred; and it is almost unnecessary to add, that they have failed in their purpose.

·I have passed over in silence many facts and circumstances, as to which the parties have employed a minute diligence in procuring proofs, because the cause must, after all, be decided by great and general principles, and cannot rest upon the comparison of the testimony, as to unessential facts. I am aware of the importance of the cause, and the amount of property involved in the decision. The parties have now had the best judgment which I have been able to form; and if it be erroneous, it is some consolation, that a superior tribunal can award ample justice to the injured. I pronounce against the claim for damage, and affirm the decree of the district court [case unreported], and order the libel to be dismissed with costs.