The UNITED STATES of America, Plaintiff-Appellee,

v.

Farris WALKER, Defendant-Appellant.

No. 11975.

United States Court of Appeals Seventh Circuit.

June 10, 1957.

Alvin A. Turner, Chicago, Ill., for appellant.

Robert Tieken, U. S. Atty., John Peter Lulinski, Asst. U. S. Atty., Chicago, Ill., Edwin A. Strugala, Asst. U. S. Attys., of counsel, for appellee.

Before DUFFY, Chief Judge, and FINNEGAN and SCHNACKENBERG, Circuit Judges.

FINNEGAN, Circuit Judge.

After a pre-trial hearing on defendant Farris Walker's motion to suppress (Fed. R.Crim.P. Rule 41, 18 U.S.C.) physical evidence taken from his person, the motion was overruled because, the trial judge thought Treasury enforcement agent D. Spillane had "reasonable ground" to believe Walker was committing a crime. That ruling is the sole basis put forward for reversal of the judgment entered upon finding Walker guilty by the district judge, sitting without a jury, on both counts of a two-count indictment.[1]

---

1. In substance, count I charged that Walker did " * * * then and there knowingly, wilfully, and unlawfully purchase from a person, whose name or names are to the said grand jury unknown, a quantity of a certain narcotic drug, to wit, approximately 343 grains of heroin," and in count 2, "fraudulently and knowingly receive, conceal, buy and facilitate the transportation and concealment after importation into the United States of a quantity of a certain narcotic drug * * *."

Section 4704(a) of the Internal Revenue Code of 1954, provides in relevant part: " * * * It shall be unlawful for any person to purchase, sell, dispense, or distribute narcotic drugs except in the original stamped package or from the original stamped package; and the absence of appropriate tax paid stamps from narcotic drugs *shall be prima facie evidence of a violation of this subsection by the person in whose possession the same may be found.*" 68A Stat. 550,

26 U.S.C. § 4704(a). (Italics supplied.)

Walker was arrested for allegedly violating the law in force and effect on August 13, 1956. Consequently it will have to be assumed that Count II citing 21 U.S.C.A. § 174 refers to the amendment of 65 Stat. 767 by the Narcotics Control Act of 1956, 70 Stat. 567, approved July 18, 1956, which through its § 105 (70 Stat. 570) provides:

"Section 2(c) of the Narcotic Drugs Import and Export Act, as amended (U.S.C. Title 21, sec. 174) is amended to read as follows:

" '(c) Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States or any territory under its control or jurisdiction, contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported or brought into the United States contrary to law, or conspires to

Walker testified in support of his motion, grounded on U. S. Const. Amendments [2] IV and V, and Federal agent Spillane gave testimony on behalf of the government on the issue raised by that motion. Adams, the other agent with Spillane at the time Walker was apprehended, did not testify at the suppression hearing. Confining ourselves, for the moment, to evidence adduced at that hearing the operative facts follow.

Walker, who had never been previously arrested, left his home on August 13, 1956 at about 1:30 in the afternoon in his automobile accompanied by two adults [one of whom was Kemp Wallis] and defendant's three-year-old grandson. While Walker was proceeding along South Parkway, a public street, in Chicago, Illinois, his automobile was curbed by another vehicle, near 43rd Street, in which Federal agents Spillane and Adams were riding. Walker and all occupants of his automobile were ordered out and told to place their hands on the top of the vehicle and submit to search. Walker testified that one of the officers said that they were under arrest, and when defendant asked the agents "if they had a warrant * * * they said sure * * *."

When Walker asked the reason for his arrest he was told to "keep quiet" and he obeyed. After being searched Walker was jailed and later released on bail. Under questioning of his own attorney, Walker stated that at the time of the arrest, search and seizure, he "was not violating any laws whatever"; "just driving down the street."

Turning now to the testimony given by Agent Spillane for the government during the suppression proceedings, he stated that on August 13, 1956 "At approximately 12:45 * * * [he] received a telephone call from an informant who * * * [he] had had previous dealings with, who had proved to be a reliable informant * * *." This testimony about the informant's reliability was stricken on motion by defense counsel so that the substance of Spillane's testimony on this phase of the case results in evidence that he received information concerning the defendant and led him to this point:

"Upon the conclusion of the conversation I made a check of the files in my office for the name Farris Walker, which check was negative. His name was not in our files.

"The second thing I did, I called the Central Police Station, the Narcotic Detail, and made a check over the telephone on Farris Walker. They gave me a positive check.

"Mr. Turner: [Defense Counsel]: I will object to what they gave him.

"The Court: Sustained."

Asked by the Assistant United States Attorney what he did "next," Spillane

---

commit any of such acts in violation of the laws of the United States, shall be imprisoned not less than five or more than twenty years and, in addition, may be fined not more than $20,000. For a second or subsequent offense (as determined under section 7237(c) of the Internal Revenue Code of 1954), the offender shall be imprisoned not less than ten or more than forty years and, in addition, may be fined not more than $20,-000.

"'Whenever on trial for a violation of this subsection the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury.

"'For provision relating to sentencing, probation, etc., see section 7237(d) of the Internal Revenue Code of 1954.'"

2. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S.Const. Amend. IV.

"No person * * * shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law * * *" U.S.Const. Amend. V.

testified: "The next thing I did, in the company of Agent Adams I proceeded to my automobile and went directly to the vicinity of 43rd and Forrestville Avenue. I parked my car on the north side of 43rd Street, a short ways east of Forrestville, and at that time I was observing a green 1950 or 1951 Pontiac Sedan that has been previously described to me over the telephone:

"I stayed in this position for maybe two, maybe one to three minutes, and then I moved the car, my own car, around the corner, went south on Forrestville, past the Pontiac in question, drove to the intersection of 44th Street and Forrestville, made a U-turn at that intersection, and I was at that time facing north on the east side of Forrestville Avenue, where I parked the car. I stayed in the car for approximately three to five minutes, and I was using binoculars at the time, observing this Pontiac, '51 Pontiac. * * *"

"I maintained surveillance on the Pontiac through binoculars for approximately three minutes, about five minutes—I am a little hazy on exactly the time I was watching it, but eventually I saw the defendant, dressed in a brown suit and a panama hat, in company of another man, whom I knew—who we had arrested maybe three weeks prior to this time —a man by the name of Kemp Wallis, and then a third party whom I didn't know, and a little boy. I saw them come around the corner, evidently came from east on 43rd, made a right turn there, walked south on Forrestville Avenue to the side of the Pontiac in question. They stood out in front of the Pontiac for a minute or two. They they [sic] all got in the car. As soon as they got in the car the driver, who was defendant Farris Walker, backed into the alley, made a U-turn, and was facing south. He backed into the alley, made a turn and proceeded north on Forrestville to the corner of 43rd and Forrestville. He made a

left turn and went west on 43rd. * * *"

" * * * I was observing the defendant, inasmuch as he answered the description that I had received over the telephone.

" * * * As I said, I was observing the defendant; he had a white panama hat and chocolate brown suit, and his description tallied with the description I had previously received."

"By the Witness: A. Yes, I did have information. The information I had was that defendant would be with Kemp Wallis.

"Mr. Turner: I will object to that.
"The Court: He has answered the question.

"By the witness: A. Who I knew from a previous arrest.

"By Mr. Makar: Q. And did you know anything concerning Kemp Wallis? A. Yes, I knew that I had arrested him.

"Mr. Turner: Your Honor, I am objecting. They are not pertinent to the motion to suppress.

"By the Witness: A. I knew Kemp Wallis due to the fact that I had executed a search warrant at 223 Forrestville a few weeks prior to this time and he was in the apartment when we raided this place.

"By Mr. Makar: Q. Did you know as to the relationship that Kemp Wallis had with this particular defendant? A. Yes, I did. Defendant, I believe, was the ex-husband of a certain Marie Walker. Marie Walker is the sister of Kemp Wallis. Marie Walker is known to our office. We have files on her; the police have files on her. Kemp Wallis we did not have a file on. But as I said he was arrested in Marie Walker's apartment a few weeks prior to the arrest of the defendant."

Continuing his direct testimony, Agent Spillane described how he and Agent Adams followed defendant's car and that

at 43rd and South Parkway Spillane pulled abreast of Walker's car; Agent Adams informed Walker that he (Adams) and Spillane were federal narcotic agents. Agent Spillane then stated: "I came out of my car, went over to his car, and asked him if his name was Farris Walker. He said it was. I told him he was under arrest * * *." After that, according to Spillane, he put Walker up against the car with his hands on top of the roof, and

"I made a search for weapons, which is part of our routine, and in searching the defendant, in his right suit coat pocket I found a Phillip Morris cigarette package containing a glassine envelope with a white powder inside it. In his left suit coat pocket I found a cellophane cigarette wrapper containing nine small pieces of notebook paper, which paper contained a white powder. I asked defendant what the stuff was. He said in substance—he said to me, 'You know what it is. It is stuff. You got me good.'"

Cross-examination of Spillane by defense counsel contains this exchange:

"Q. You didn't hear this man's voice on the telephone, or any other man's voice on the telephone, did you? A. Only the informer's voice.

"Q. Only the informer's voice. Now then, you had no record, there is no record in your department of Farris Walker being a violator of narcotic laws. There was not at the time you received this call from the informer? A. Not in our department.

"Q. Not in your department. That is what I [am] asking you, in your department. So that at the time you went out on the South Side of Chicago you had no knowledge, you knew nothing about Farris Walker, did you? A. I knew his description.

"Q. Of your own knowledge? Wait a minute. You see I am just asking you a plain question. Maybe I will come back and let you say what you want to say. You had no knowledge of your own about Farris Walker, did you? A. I don't know him.

"Q. You didn't know him, did you? A. No."

■ Obviously we must first decide [3] if this arrest of Walker without a warrant was valid in order to determine the legality of the search clearly incidental to that apprehension. No array of authorities is necessary for supporting the familiar rule that lawful arrest is an indispensable condition precedent to a closely allied search and seizure.[4]

Several important aspects of the problem now under review were subjected to judicial scrutiny in United States v. Jeffers, 1951, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59, where Mr. Justice Clark, writing for the majority, stated:

"The Fourth Amendment prohibits both unreasonable searches and unreasonable seizures * * *. Over and again this Court has emphasized that the mandate of the Amendment requires adherence to judicial processes. See Weeks v. United States, 1914, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652; Agnello v. United States, 1925, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145. Only where incident to a valid arrest, United States v. Rabinowitz, 1950, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653, or in 'exceptional circum-

3. "There is no formula for the determination of reasonableness of the search and seizure. Each case is to be decided on its own facts and circumstances." Rocchia v. United States, 9 Cir., 1935, 78 F.2d 966, 969.

4. "When a man is legally arrested for an offense, whatever is found upon his person or in his control which it is unlawful for him to have and which may be used to prove the offense may be seized and held as evidence in the prosecution." Carroll v. United States, 1925, 267 U.S. 132, 158, 45 S.Ct. 280, 287, 69 L.Ed. 543.

stances,' Johnson v. United States, 1948, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436, may an exemption lie, and then the burden is on those seeking the exemption to show the need for it, McDonald v. United States, 1948, 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153. In so doing the Amendment does not place an unduly oppressive weight on law enforcement officers but merely interposes an orderly procedure under the aegis of judicial impartiality that is necessary to attain the beneficent purposes intended. * * * Officers instead of obeying this mandate have too often, as shown by the numerous cases in this Court, taken matters into their own hands and invaded the security of the people against unreasonable search and seizure."

Congress has supplied a new factor, in narcotic cases through the vehicle of the Narcotic Control Act of 1956 under § 104(a), of which, power is conferred upon agents of the Bureau of Narcotics to: " * * * make arrests without warrant for violations of any law of the United States relating to narcotic drugs * * * or marihuana * * * where the violation is committed in the presence of the person making the arrest or where such person has *reasonable grounds* to believe that the person to be arrested has committed or is committing such violation." 70 Stat. 570, 26 U.S.C. § 7607. (Supp. IV, 1957.) (Italics ours.)

Of course even under a legislative enactment typified by § 104(a) we would refrain from permitting such authority to override constitutional rights and privileges. Use of legislative history requires caution and critical analysis. With that awareness we think § 104(a) reflects Congressional response to the narcotics situation in our country and that, indeed, it is a problem. See e. g. Narcotics, 22 Law & Contemp. Problems (1957). Difficulties confronting the law enforcement branches of government charged with enforcing the relevant laws were described in the House Subcommittee Report on Narcotics, 2 U.S. Code Cong. & Adm.News p. 3302 (1956).

"Your subcommittee's inquiry into the enforcement program revealed serious obstacles which have been placed in the path of enforcement officers as the result of recent court decisions. These decisions have tended, under certain circumstances, to furnish the criminal with a cloak of immunity to the detriment of society as a whole. They have forced changes in recognized investigative procedures which had been sanctioned by the courts for many years. The narcotic traffickers, who are in most cases well-organized professional racketeers, take full advantage of any limitations placed on enforcement officers.

"In some instances enforcement officers have been restricted in their right to arrest without a warrant, and to search and seize contraband before and after a valid arrest. The use of evidence of admissions and confessions following an arrest has been curtailed. Narcotic enforcement officers are restrained from intercepting telephone conversations, even though the telephone is a major instrument of communication between the top narcotic traffickers, and could often provide the necessary evidence to convict these violators. The enforcement officers are required to secure an arrest warrant or a search warrant from a magistrate even though circumstances indicate the impracticability of such a procedure. Narcotic drugs are small in volume and high in price. A fortune in drugs can be concealed under clothing and can be destroyed, or moved to a place of safety on a moment's notice. The delay involved in obtaining a warrant from a magistrate permits the destruction or removal of the narcotic evidence and allows the narcotic traffickers to escape prosecution for their crime. These and other restrictions on enforcement officers leave the public

unprotected and give narcotic violators, especially the more reprehensible larger racketeers and wholesalers, an advantage over law-enforcement officers in efforts to combat the illicit narcotic traffic. The subcommittee urges that corrective measures in these areas be taken immediately to permit enforcement officers to operate more effectively."

Our decision takes shape against that background but with constitutional rights outweighing any practical considerations which would ultimately generate corrosion of those privileges.

After reversal of the conviction under review in United States v. Coplon, 2 Cir., 1950, 185 F.2d 629, 28 A.L.R.2d 1041. Congress amended § 3052 of Title 18 U.S.Code to read: "The Director, Associate Director, Assistant to the Director, Assistant Directors, inspectors, and agents of the Federal Bureau of Investigation of the Department of Justice may * * * make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States *if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony."* 64 Stat. 1239, 18 U.S.C. § 3052 (Supp. IV, 1952 ed.) (Italics added). Because the italicized language is now virtually identical with that phraseology used in § 104(a) (2) we thought it significant, especially in light of the legislation following in the wake of Judge Learned Hand's disposition of the Coplon arrest under the earlier version of § 3052. 185 F.2d 629, 634–635. See also: Coplon v. United States, 1951, 89 U.S.App.D.C. 103, 191 F.2d 749, 753–754 decided under the wording of 18 U.S.C. § 3052 as it stood on March 4, 1949. If Judge Hand thought that "the Act of 1934 was intended to be a constitutive, not a cumulative, grant of any powers of arrest without warrant which the agents were to have," [185 F.2d 635] certainly the latest version, paralleled by § 104(a) (2), has eliminated the strictures he found lurking in § 3052. We

think United States v. Di Re, 1948, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 is distinguishable because since that decision, Congress enacted a federal rule of arrest for agents of the Narcotics Bureau. Section 104(a) (2) is the legislative source of power and authority under which the arrest of Walker must be measured. Resort can be made to closely analogous precedent for ascertaining the meaning of "reasonable grounds" in that section.

 Reasonable grounds is the precursor to a valid arrest without a warrant under § 104(a) (2) and a subsequent successful search does not cure an otherwise defective arrest. The arrest of Walker must be validated without any resort to the fruits of the search. At the hearing below the trial judge unduly restricted the government's showing because that proceeding in no way concerned the issue of Walker's guilt or innocence. The key issue at that suppression hearing was whether Spillane had reasonable grounds to believe that Walker had committed or was committing a violation of any law of the United States relating to narcotic drugs. Communication emanating from the informer was relevant to show that Spillane obtained knowledge about Walker forming the foundation on which the agent built his cause for acting. The informer's testimony was not offered at the pre-trial hearing for the purpose of proving Walker guilty of the offenses for which he was about to be tried—the issue at that preliminary stage is related to Spillane's state of mind. See e. g. 6 Wigmore, Evidence § 1789 (3rd ed. 1940). We think under the facts developed here, evidence classed as hearsay from Walker's viewpoint, but not Spillane's, can constitute the basis for reasonable grounds leading to an arrest without a warrant.

That Walker's arrest preceded the challenged search is undisputed on the record before us. The Agents stopped Walker's car only because of what the informer related to them, coupled with their check of police records, and not because they were impelled by their ob-

servations. Nothing else shows in this record as the basis for apprehending Walker and, of course, the narcotics in his coat pocket were not open to view until Spillane "frisked" Walker. Statutes aside, an arrest without a warrant on bare suspicion unsupported by reasonable grounds is illegal. "Probable cause" and "reasonable grounds" are concepts having virtually the same meaning.[5] Chief Justice Shaw, speaking for a court reviewing an action for malicious prosecution, wrote in Bacon v. Towne, 1849, 58 Mass. 217, 238–239: "Probable cause is such a state of facts in the mind of the prosecutor as would lead a man of ordinary caution and prudence to believe, or entertain an honest and strong suspicion, that the person arrested is guilty." Even earlier in our judicial history Chief Justice Marshall had already stated this interpretation: " * * * the term 'probable cause', according to its usual acceptation, means less than evidence which would justify condemnation; and in all cases of seizure, has a fixed and well-known meaning, it imports a seizure made under circumstances which warrant suspicion * * *." Locke v. United States, 1813, 11 U.S. 338, 348, 7 Cranch 339, 3 L.Ed. 364.

United States v. Sebo, 7 Cir., 1939, 101 F.2d 889, 890, evoked our court's view: "Probable cause has been defined as reasonable grounds of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the party is guilty of the offense with which he is charged."

▐ When, as here, a search and seizure is intimately related to an arrest without a warrant, the legality of the arrest dictates whether the search is unreasonable and running afoul of the Fourth Amendment. See: e. g. J. Hall, Legal and Social Aspects of Arrest Without a Warrant, 49 · Har.L.Rev. 566 (1936); Sam B. Warner, The Uniform Arrest Act, 28 Va.L.Rev. 315, 331 (1942). To evaluate Spillane's action without a warrant requires reaching back behind his reason for categorizing Walker as suspect. The cue to such categorization was supplied by the informer to Spillane

---

5. Carroll v. United States, 1925, 267 U.S. 132, 161–162, 45 S.Ct. 280, 288, 69 L.Ed. 543, contains the familiar summary by Mr. Chief Justice Taft, when speaking for the majority of a divided court:

"The necessity for probable cause in justifying seizures on land or sea, in making arrests without warrant for past felonies, and in malicious prosecution and false imprisonment cases has led to frequent definition of the phrase. In Stacey v. Emery, 97 U.S. 642, 645 (24 L.Ed. 1035), a suit for damages for seizure by a collector, this court defined probable cause as follows:

" 'If the facts and circumstances before the officer are such as to warrant a man of prudence and caution in believing that the offense has been committed, it is sufficient.' See Locke v. United States, 7 Cranch 339, 3 · L.Ed. 364; The George, 1 Mason 24, Fed.Cas.No.5,328; The Thompson, 3 Wall. 155, 18 L.Ed. 55. It was laid down by Chief Justice Shaw, in Commonwealth v. Carey, 12 Cush., Mass., 246, 251 that 'if a constable or other peace officer arrest a person without a warrant, he is not bound to show in his justification a felony actually committed, to render the arrest lawful; but if he sus-

pects one on his own knowledge of facts, or on facts communicated to him by others, and thereupon he has reasonable ground to believe that the accused has been guilty of felony, the arrest is not unlawful.' Commonwealth v. Phelps, 209 Mass. 396, 95 N.E. 868; Rohan v. Sawin, 5 Cush.,Mass., 281, 285. In McCarthy v. DeArmit, 99 Pa.[St.] 63, at page 69, the Supreme Court of Pennsylvania sums up the definition of probable cause in this way:

" 'The substance of all the definitions is a reasonable ground for belief in guilt.'

"In the case of the Director General of Railroads v. Kastenbaum, 263 U.S. 25, at page 28, 44 S.Ct. 52, 53, 68 L.Ed. 146, which was a suit for false imprisonment, it was said by this Court:

" 'But, as we have seen, good faith is not enough to constitute probable cause. That faith must be grounded on facts within knowledge of the Director General's agent, which in the judgment of the court would make his faith reasonable.' "

The term "reasonable ground" was subjected to judicial evaluation in United States v. Bell, D.C.Cal.1943, 48 F.Supp. 986, 992 and we think the interpretation sponsored there is sound.

who, in turn, used that data, along with other information, for deciding if Walker had committed or was (at that time) committing a violation. Obviously what the informer said became the stimulus input for Spillane and a trial judge should evaluate such evidence when deciding if Spillane acted on reasonable grounds. In Costello v. United States, 1956, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 755, all of the evidence before the grand jury was in the nature of "hearsay" yet that condition did not invalidate the indictment. The technical rules of evidence regarding hearsay come into greater importance at a trial on the merits especially when jurors are participating. But in an instance of the type now before us strict application of the hearsay [6] rule is a sterile technicality if not an incorrect application of the exclusionary rule. If the government's offer [7] of proof is examined along with those pieces of testimony received below there emerges the requisite reasonable grounds for Walker's arrest and approval of the search. That defendant was travelling by automobile explains the need for action without a warrant. Brinegar v. United States, 338 U.S. 160, 175–178, 69 S.Ct. 1302, 93 L.Ed. 1879.

■ "Reasonable ground," then, is the litmus paper for testing validity of arrests without a warrant. Implicit in such test is the exclusion of arbitrary and capricious interference with individual freedom. Dignity and sanctity of the individual are not to be jeopardized by the whim or zeal of policemen. Consequently organic law, reflected in the relevant statutes and Rules of Criminal Procedure interposes the judiciary between law enforcement officers and citi-

6. For example, see: United States v. Li Fat Tong, 2 Cir., 1945, 152 F.2d 650, 652: "But it is contended that it [an arrest without a warrant] was unlawful because based upon hearsay evidence obtained from the Chicago Office [of the Narcotic Bureau] and through informers whose names were not divulged. We recently held, however, in United States v. Heitner, 2 Cir., 149 F.2d 105, 106 that an arrest may be made upon hearsay evidence, and cited as authority the ruling in Carroll v. United States, 267 U.S. 132, 160, 161, 45 S.Ct. 280, 69 L.Ed. 543; Dumbra v. United States, 268 U.S. 435, 441, 45 S.Ct. 546, 69 L.Ed. 1032; Husty v. United States, 282 U.S. 694, 700, 701, 51 S.Ct. 240, 75 L.Ed. 629."

7. "If he would be permitted to testify as to the phone conversation he had with the informer prior to any of the acts which had occurred and about which this witness had testified concerning the arrest and the search of the particular defendant, this witness would testify as to the following:

"That he received information from an informer, whom he recognized and had previous dealings with that informer. He recognized that informer's voice. And that the informer told him that this particular defendant, naming him as Farris Walker, also known as Brownie Walker, had purchased an ounce of heroin and which did not have any stamp of the Treasury Department of the United States; and that this particular defendant was then in the process of bagging it up, partly by diluting that particular substance which he had just purchased, and was then in the process of diluting it and was going to make a sale of a portion of that substance; that it would not take him more, would not take the defendant more than a half an hour at the most before he would proceed to a 1950 or 1951 Pontiac, with the particular description of being a green automobile, which was parked immediately to the south of the alley just south of 43rd Street and the automobile was facing north. I'm sorry—the automobile was facing south on Forrestville, and would be on the west side of Forrestville; that this particular defendant, Farris Walker, is dressed, and would be dressed in a panama hat and brown suit, and he is described as a very slender man, about five feet five inches tall, weighing about 120 or 25, 125 pounds, and that he would be in the company of one Kemp Wallis, and both of them were in the process of going out and making a sale to another individual. That, incidentally, the particular vehicle did not have any license plates, and that time was eminent insofar as if the agents were going to do anything concerning this particular defendant that he would be leaving in half an hour and he does not know where he would go, nor does he know the address of the particular—where the defendant was staying at the time."

zens by requiring, as normal procedure, application for warrants and the attendant opportunity for the judicial branch to pass on the question of probable cause. This constitutional insulation against infringing basic rights is removed only under classes of exigencies which have been judicially approved on review and now form a discernible pattern of instances, excusing law-enforcement officers for by-passing the requirement of having the judiciary first rule upon the question of probable cause. In those situations the law is adjusted and imposes on the law enforcement agent a standard of discrimination. Rather than blind worship of cause alone, the law probes for the basis of the officer's action measuring it by an external standard. After all when an arrest without a warrant is classed as valid, it simply means such action is judicially tolerated as being within the constitutional bounds of reasonableness as officially or pragmatically defined in case-law. Fresh combinations of facts must necessarily be examined under the terms labelled "probable cause" and "reasonable grounds" for neither one is a static concept. But the criteria embedded in each continues to be one that refuses approval for arrests without a warrant where an officer is stimulated by an inkling only. For he must act as a man of reasonable caution. "Suspicion" is an elusive word with a wide spectrum of intensities and courts must examine the facts underlying it rather than be deflected by the word itself.

Roviaro v. United States, 1957, 353 U.S. 53, 77 S.Ct. 623, 628, 1 L.Ed.2d 639, appears, on cursory examination, to cast a shadow across this opinion. But nothing said there requires any different decision in Walker's case despite the fact that an unnamed informer stimulated the agent's activities in this situation. Counsel for Walker did not request disclosure of the informer's identity, and he would have to make that request to come within this passage by the Roviaro majority:

"Most of the federal cases involving this limitation on the scope of the informer's privilege have arisen where the legality of a search without a warrant is in issue and the communications of an informer are claimed to establish probable cause. In these cases the Government has been required to disclose the identity of the informant *unless there was sufficient evidence apart from his confidential communication.*" Citing Scher v. United States, 305 U.S. 251, 59 S.Ct. 174, 83 L.Ed. 151; United States v. Li Fat Tong, 2 Cir., 152 F.2d 650; Wilson v. United States, 3 Cir., 59 F.2d 390; and United States v. Keown, D.C., 19 F.Supp. 639. (Italics added.)

In any event without a proper demand below for the informer's identity [8] this case is outside the scope of the Roviaro holding. See United States v. Conforti, 7 Cir., 1953, 200 F.2d 365. That Contee v. United States, 1954, 94 U.S.App.D.C. 297, 215 F.2d 324, 326, is inapposite is patent from the flimsy testimony given by the arresting officers, in that appeal.

By overruling the motion to suppress, interposed on Walker's behalf, the trial judge reached the correct result, and we affirm the judgment brought here for review.

Judgment affirmed.

---

8. Nor was there any assertion of privilege on the government's part, in this appeal, as discussed in Jencks v. United States, 1957, 77 S.Ct. 1007, 1013. In Jenck's, after observing that the testimony of Ford and Matusow were crucial to the government's case during the trial of Jenck's, it was said for the majority: "We now hold that the petitioner was entitled to an order directing the Government to produce for inspection all re-

ports of Matusow and Ford in its possession * * * touching the events and activities as to which they *testified* at the trial." (Our italics.) We make this mention of the Jenck's case where numerous requests were made by the defense for the F.B.I. reports, solely for distinguishing it from Walker in which no demands of any kind were made of the government by the defense.